(Slip Opinion) OCTOBER TERM, 2019 1

 Syllabus

 NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
 being done in connection with this case, at the time the opinion is issued.
 The syllabus constitutes no part of the opinion of the Court but has been
 prepared by the Reporter of Decisions for the convenience of the reader.
 See United States v. Detroit Timber & Lumber Co., 200 U. S. 321, 337.

SUPREME COURT OF THE UNITED STATES

 Syllabus

 HERNANDEZ ET AL. v. MESA

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR
 THE FIFTH CIRCUIT

No. 17–1678. Argued November 12, 2019—Decided February 25, 2020
Respondent, United States Border Patrol Agent Jesus Mesa, Jr., shot
 and killed Sergio Adrián Hernández Güereca, a 15-year-old Mexican
 national, in a tragic and disputed cross-border incident. Mesa was
 standing on U. S. soil when he fired the bullets that struck and killed
 Hernández, who was on Mexican soil, after having just run back across
 the border following entry onto U. S. territory. Agent Mesa contends
 that Hernández was part of an illegal border crossing attempt, while
 petitioners, Hernández’s parents, claim he was playing a game with
 his friends that involved running back and forth across the culvert sep-
 arating El Paso, Texas, from Ciudad Juarez, Mexico. The shooting
 drew international attention, and the Department of Justice investi-
 gated, concluded that Agent Mesa had not violated Customs and Bor-
 der Patrol policy or training, and declined to bring charges against
 him. The United States also denied Mexico’s request for Agent Mesa
 to be extradited to face criminal charges in Mexico.
 Petitioners sued for damages in U. S. District Court under Bivens v.
 Six Unknown Fed. Narcotics Agents, 403 U. S. 388, alleging that Mesa
 violated Hernández’s Fourth and Fifth Amendment rights. The Dis-
 trict Court dismissed their claims, and the United States Court of Ap-
 peals for the Fifth Circuit affirmed. After this Court vacated that de-
 cision and remanded for further consideration in light of Ziglar v.
 Abbasi, 582 U. S. ___, the Fifth Circuit again affirmed, refusing to rec-
 ognize a Bivens claim for a cross-border shooting.
Held: Bivens’ holding does not extend to claims based on a cross-border
 shooting. Pp. 4–20.
 (a) In Bivens, the Court implied a Fourth Amendment claim for
 damages even though no federal statute authorized such a claim. The
 Court later extended Bivens’ reach to cover claims under the Fifth and
2 HERNANDEZ v. MESA

 Syllabus

 Eighth Amendments. See Davis v. Passman, 442 U. S. 228; Carlson v.
 Green, 446 U. S. 14. But Bivens’ expansion has since become “a ‘disfa-
 vored’ judicial activity,” Abbasi, supra, at ___, and the Court has gen-
 erally expressed doubt about its authority to recognize causes of action
 not expressly created by Congress, see, e.g., Jesner v. Arab Bank, PLC,
 584 U. S. ___, ___. When considering whether to extend Bivens, the
 Court uses a two-step inquiry that first asks whether the request in-
 volves a claim that arises in a “new context” or involves a “new cate-
 gory of defendants.” Correctional Services Corp. v. Malesko, 534 U. S.
 61, 68. If so, the Court then asks whether there are any “special factors
 [that] counse[l] hesitation” about granting the extension. Abbasi,
 supra, at ___. Pp. 4–8.
 (b) Petitioners’ Bivens claims arise in a new context. Their claims
 are based on the same constitutional provisions as claims in cases in
 which damages remedies were previously recognized, but the con-
 text—a cross-border shooting—is significantly “different . . . from pre-
 vious Bivens cases.” Abbasi, supra, ___. It involves a “risk of disrup-
 tive intrusion by the Judiciary into the functioning of other branches.”
 Abbasi, supra, ___. Pp. 8–9.
 (c) Multiple, related factors counsel hesitation before extending
 Bivens remedies into this new context. Pp. 9–19.
 (1) The expansion of a Bivens remedy that impinges on foreign re-
 lations—an arena “so exclusively entrusted to the political branches
 . . . as to be largely immune from judicial inquiry,” Haig v. Agee, 453
 U. S. 280, 292—risks interfering with the Executive Branch’s “lead
 role in foreign policy,” Medellín v. Texas, 552 U. S. 491, 524. A cross-
 border shooting affects the interests of two countries and, as happened
 here, may lead to disagreement. It is not for this Court to arbitrate
 between the United States and Mexico, which both have legitimate and
 important interests at stake and have sought to reconcile those inter-
 ests through diplomacy. Pp. 9–12.
 (2) Another factor is the risk of undermining border security. The
 U. S. Customs and Border Protection Agency is responsible for pre-
 venting the illegal entry of dangerous persons and goods into the
 United States, and the conduct of their agents positioned at the border
 has a clear and strong connection to national security. This Court has
 not extended Bivens where doing so would interfere with the system of
 military discipline created by statute and regulation, see, e.g., Chap-
 pell v. Wallace, 462 U. S. 296, and a similar consideration is applicable
 to the framework established by the political branches for addressing
 cases in which it is alleged that lethal force at the border was unlaw-
 fully employed by a border agent. Pp. 12–14.
 (3) Moreover, Congress has repeatedly declined to authorize the
 award of damages against federal officials for injury inflicted outside
 Cite as: 589 U. S. ____ (2020) 3

 Syllabus

 U. S. borders. For example, recovery under 42 U. S. C. §1983 is avail-
 able only to “citizen[s] of the United States or other person[s] within
 the jurisdiction thereof.” The Federal Tort Claims Act bars “[a]ny
 claim arising in a foreign country.” 28 U. S. C. §2680(k). And the Tor-
 ture Victim Protection Act of 1991, note following 28 U. S. C. §1350,
 cannot be used by an alien to sue a United States officer. When Con-
 gress has provided compensation for injuries suffered by aliens outside
 the United States, it has done so by empowering Executive Branch of-
 ficials to make payments under circumstances found to be appropriate.
 See, e.g., Foreign Claims Act, 10 U. S. C. §2734. Congress’s decision
 not to allow suit in these contexts further indicates that the Judiciary
 should not create a cause of action that extends across U. S. borders
 either. Pp. 14–18.
 (4) These factors can all be condensed to the concern for respecting
 the separation of powers. The most important question is whether
 Congress or the courts should create a damages remedy. Here the an-
 swer is Congress. Congress’s failure to act does not compel the Court
 to step into its shoes. Pp. 19–20.
885 F. 3d 811, affirmed.

 ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J.,
and THOMAS, GORSUCH, and KAVANAUGH, JJ., joined. THOMAS, J., filed a
concurring opinion, in which GORSUCH, J., joined. GINSBURG, J., filed a
dissenting opinion, in which BREYER, SOTOMAYOR, and KAGAN, JJ.,
joined.
 Cite as: 589 U. S. ____ (2020) 1

 Opinion of the Court

 NOTICE: This opinion is subject to formal revision before publication in the
 preliminary print of the United States Reports. Readers are requested to
 notify the Reporter of Decisions, Supreme Court of the United States, Wash-
 ington, D. C. 20543, of any typographical or other formal errors, in order that
 corrections may be made before the preliminary print goes to press.

SUPREME COURT OF THE UNITED STATES
 _________________

 No. 17–1678
 _________________

 JESUS C. HERNANDEZ, ET AL., PETITIONERS v.
 JESUS MESA, JR.
 ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
 APPEALS FOR THE FIFTH CIRCUIT
 [February 25, 2020]

 JUSTICE ALITO delivered the opinion of the Court.
 We are asked in this case to extend Bivens v. Six Un-
known Fed. Narcotics Agents, 403 U. S. 388 (1971), and cre-
ate a damages remedy for a cross-border shooting. As we
have made clear in many prior cases, however, the Consti-
tution’s separation of powers requires us to exercise caution
before extending Bivens to a new “context,” and a claim
based on a cross-border shooting arises in a context that is
markedly new. Unlike any previously recognized Bivens
claim, a cross-border shooting claim has foreign relations
and national security implications. In addition, Congress
has been notably hesitant to create claims based on alleg-
edly tortious conduct abroad. Because of the distinctive
characteristics of cross-border shooting claims, we refuse to
extend Bivens into this new field.
 I
 The facts of this tragic case are set forth in our earlier
opinion in this matter, Hernández v. Mesa, 582 U. S. ___
(2017) (per curiam). Sergio Adrián Hernández Güereca, a
15-year-old Mexican national, was with a group of friends
in a concrete culvert that separates El Paso, Texas, from
2 HERNANDEZ v. MESA

 Opinion of the Court

Ciudad Juarez, Mexico. The border runs through the center
of the culvert, which was designed to hold the waters of the
Rio Grande River but is now largely dry. Border Patrol
Agent Jesus Mesa, Jr., detained one of Hernández’s friends
who had run onto the United States’ side of the culvert. Af-
ter Hernández, who was also on the United States’ side, ran
back across the culvert onto Mexican soil, Agent Mesa fired
two shots at Hernández; one struck and killed him on the
other side of the border.
 Petitioners and Agent Mesa disagree about what Her-
nández and his friends were doing at the time of shooting.
According to petitioners, they were simply playing a game,
running across the culvert, touching the fence on the U. S.
side, and then running back across the border. According
to Agent Mesa, Hernández and his friends were involved in
an illegal border crossing attempt, and they pelted him with
rocks.1
 The shooting quickly became an international incident,
with the United States and Mexico disagreeing about how
the matter should be handled. On the United States’ side,
the Department of Justice conducted an investigation.
When it finished, the Department, while expressing regret
over Hernández’s death, concluded that Agent Mesa had
not violated Customs and Border Patrol policy or training,
and it declined to bring charges or take other action against
him. Mexico was not and is not satisfied with the U. S. in-
vestigation. It requested that Agent Mesa be extradited to
face criminal charges in a Mexican court, a request that the
United States has denied.
 Petitioners, Hernández’s parents, were also dissatisfied

——————
 1 See App. to Pet. for Cert. 198–199; Dept. of Justice, Federal Officials

Close Investigation Into the Death of Sergio Hernandez-Guereca
(Apr. 27, 2012), https://www.justice.gov/opa/pr/federal-officials-close-
investigation-death-sergio-hernandez-guereca (hereinafter DOJ Press
Release).
 Cite as: 589 U. S. ____ (2020) 3

 Opinion of the Court

and therefore brought suit for damages in the United States
District Court for the Western District of Texas. Among
other claims, they sought recovery of damages under
Bivens, alleging that Mesa violated Hernández’s Fourth
and Fifth Amendment rights. The District Court granted
Mesa’s motion to dismiss, and the Court of Appeals for
the Fifth Circuit sitting en banc has twice affirmed this
dismissal.
 On the first occasion, the court held that Hernández was
not entitled to Fourth Amendment protection because he
was “a Mexican citizen who had no ‘significant voluntary
connection’ to the United States” and “was on Mexican soil
at the time he was shot.” Hernandez v. United States, 785
F. 3d 117, 119 (CA5 2015) (per curiam). It further con-
cluded that Mesa was entitled to qualified immunity on pe-
titioners’ Fifth Amendment claim. Id., at 120.
 After granting review, we vacated the Fifth Circuit’s de-
cision and remanded the case, instructing the court “to con-
sider how the reasoning and analysis” of Ziglar v. Abbasi,
582 U. S. ___ (2017), our most recent explication of Bivens,
“[might] bear on this case.” Hernández, 582 U. S., at ___
(slip op., at 5). We found it “appropriate for the Court of
Appeals, rather than this Court, to address the Bivens ques-
tion in the first instance.” Ibid. And with the Bivens issue
unresolved, we thought it “imprudent” to resolve the “sen-
sitive” question whether the Fourth Amendment applies to
a cross-border shooting. Ibid. In addition, while rejecting
the ground on which the Court of Appeals had held that
Agent Mesa was entitled to qualified immunity, we declined
to decide whether he was entitled to qualified immunity on
a different ground or whether petitioners’ claim was cog-
nizable under the Fifth Amendment. Id., at ___–___ (slip
op., at 5–6).
 On remand, the en banc Fifth Circuit evaluated petition-
ers’ case in light of Abbasi and refused to recognize a Bivens
claim for a cross-border shooting. 885 F. 3d 811 (CA5 2018).
4 HERNANDEZ v. MESA

 Opinion of the Court

The court reasoned that such an incident presents a “ ‘new
context’ ” and that multiple factors—including the inci-
dent’s relationship to foreign affairs and national security,
the extraterritorial aspect of the case, and Congress’s “re-
peated refusals” to create a damages remedy for injuries in-
curred on foreign soil––counseled against an extension of
Bivens. 885 F. 3d, at 816–823.
 We granted certiorari, 587 U. S. ___ (2019), and now
affirm.
 II
 In Bivens v. Six Unknown Fed. Narcotics Agents, 403
U. S. 388, the Court broke new ground by holding that a
person claiming to be the victim of an unlawful arrest and
search could bring a Fourth Amendment claim for damages
against the responsible agents even though no federal stat-
ute authorized such a claim. The Court subsequently ex-
tended Bivens to cover two additional constitutional claims:
in Davis v. Passman, 442 U. S. 228 (1979), a former con-
gressional staffer’s Fifth Amendment claim of dismissal
based on sex, and in Carlson v. Green, 446 U. S. 14 (1980),
a federal prisoner’s Eighth Amendment claim for failure to
provide adequate medical treatment. After those decisions,
however, the Court changed course.
 Bivens, Davis, and Carlson were the products of an era
when the Court routinely inferred “causes of action” that
were “not explicit” in the text of the provision that was al-
legedly violated. Abbasi, 582 U. S., at ___ (slip op., at 8).
As Abbasi recounted:
 “During this ‘ancien regime,’ . . . the Court assumed it
 to be a proper judicial function to ‘provide such reme-
 dies as are necessary to make effective’ a statute’s pur-
 pose . . . . Thus, as a routine matter with respect to
 statutes, the Court would imply causes of action not ex-
 plicit in the statutory text itself.” Ibid. (quoting Alex-
 ander v. Sandoval, 532 U. S. 275, 287 (2001); J. I. Case
 Cite as: 589 U. S. ____ (2020) 5

 Opinion of the Court

 Co. v. Borak, 377 U. S. 426, 433 (1964)).
Bivens extended this practice to claims based on the Con-
stitution itself. 582 U. S., at ___ (slip op., at 8); Bivens, 403
U. S., at 402 (Harlan, J., concurring in judgment) (Court
can infer availability of damages when, “in its view, dam-
ages are necessary to effectuate” the “policy underpinning
the substantive provisio[n]”).
 In later years, we came to appreciate more fully the ten-
sion between this practice and the Constitution’s separa-
tion of legislative and judicial power. The Constitution
grants legislative power to Congress; this Court and the
lower federal courts, by contrast, have only “judicial
Power.” Art. III, §1. But when a court recognizes an im-
plied claim for damages on the ground that doing so fur-
thers the “purpose” of the law, the court risks arrogating
legislative power. No law “ ‘pursues its purposes at all
costs.’ ” American Express Co. v. Italian Colors Restaurant,
570 U. S. 228, 234 (2013) (quoting Rodriguez v. United
States, 480 U. S. 522, 525–526 (1987) (per curiam)). In-
stead, lawmaking involves balancing interests and often de-
mands compromise. See Board of Governors, FRS v. Di-
mension Financial Corp., 474 U. S. 361, 373–374 (1986).
Thus, a lawmaking body that enacts a provision that cre-
ates a right or prohibits specified conduct may not wish to
pursue the provision’s purpose to the extent of authorizing
private suits for damages. For this reason, finding that a
damages remedy is implied by a provision that makes no
reference to that remedy may upset the careful balance of
interests struck by the lawmakers. See ibid.
 This problem does not exist when a common-law court,
which exercises a degree of lawmaking authority, fleshes
out the remedies available for a common-law tort. Analo-
gizing Bivens to the work of a common-law court, petition-
ers and some of their amici make much of the fact that
common-law claims against federal officers for intentional
6 HERNANDEZ v. MESA

 Opinion of the Court

torts were once available. See, e.g., Brief for Petitioners 10–
20. But Erie R. Co. v. Tompkins, 304 U. S. 64, 78 (1938),
held that “[t]here is no federal general common law,” and
therefore federal courts today cannot fashion new claims in
the way that they could before 1938. See Alexander, 532
U. S., at 287 (“ ‘Raising up causes of action where a statute
has not created them may be a proper function for common-
law courts, but not for federal tribunals’ ”).
 With the demise of federal general common law, a federal
court’s authority to recognize a damages remedy must rest
at bottom on a statute enacted by Congress, see id., at 286
(“private rights of action to enforce federal law must be cre-
ated by Congress”), and no statute expressly creates a
Bivens remedy. Justice Harlan’s Bivens concurrence ar-
gued that this power is inherent in the grant of federal
question jurisdiction, see 403 U. S., at 396 (majority opin-
ion); id., at 405 (opinion of Harlan, J.), but our later cases
have demanded a clearer manifestation of congressional in-
tent, see Abbasi, 582 U. S., at ___–___ (slip op., at 10–12).
 In both statutory and constitutional cases, our watch-
word is caution. For example, in Jesner v. Arab Bank, PLC,
584 U. S. ___, ___–___ (2018) (slip op., at 18–19) we ex-
pressed doubt about our authority to recognize any causes
of action not expressly created by Congress. See also Ab-
basi, 582 U. S., at ___ (slip op., at 9) (“If the statute does not
itself so provide, a private cause of action will not be created
through judicial mandate”). And we declined to recognize a
claim against a foreign corporation under the Alien Tort
Statute. Jesner, 584 U. S., at ___ (slip op., at 29).
 In constitutional cases, we have been at least equally re-
luctant to create new causes of action. We have recognized
that Congress is best positioned to evaluate “whether, and
the extent to which, monetary and other liabilities should
be imposed upon individual officers and employees of the
Federal Government” based on constitutional torts. Ab-
basi, 582 U. S., at ___ (slip op., at 10). We have stated that
 Cite as: 589 U. S. ____ (2020) 7

 Opinion of the Court

expansion of Bivens is “a ‘disfavored’ judicial activity,” 582
U. S., at ___ (slip op., at 11) (quoting Ashcroft v. Iqbal, 556
U. S. 662, 675 (2009)), and have gone so far as to observe
that if “the Court’s three Bivens cases [had] been . . . de-
cided today,” it is doubtful that we would have reached the
same result, 582 U. S., at ___ (slip op., at 11). And for al-
most 40 years, we have consistently rebuffed requests to
add to the claims allowed under Bivens. See 582 U. S., at
___ (slip op., at 23); Minneci v. Pollard, 565 U. S. 118 (2012);
Wilkie v. Robbins, 551 U. S. 537 (2007); Correctional Ser-
vices Corp. v. Malesko, 534 U. S. 61 (2001); FDIC v. Meyer,
510 U. S. 471 (1994); Schweiker v. Chilicky, 487 U. S. 412
(1988); United States v. Stanley, 483 U. S. 669 (1987); Chap-
pell v. Wallace, 462 U. S. 296 (1983); Bush v. Lucas, 462
U. S. 367 (1983).
 When asked to extend Bivens, we engage in a two-step
inquiry. We first inquire whether the request involves a
claim that arises in a “new context” or involves a “new cat-
egory of defendants.” Malesko, 534 U. S., at 68. And our
understanding of a “new context” is broad. We regard a
context as “new” if it is “different in a meaningful way from
previous Bivens cases decided by this Court.” Abbasi, 582
U. S., at ___ (slip op., at 16).
 When we find that a claim arises in a new context, we
proceed to the second step and ask whether there are any
“ ‘ “special factors [that] counse[l] hesitation” ’ ” about grant-
ing the extension. Id., at ___ (slip op., at 12) (quoting Carl-
son, 446 U. S., at 18, in turn quoting Bivens, 403 U. S., at
396). If there are––that is, if we have reason to pause before
applying Bivens in a new context or to a new class of de-
fendants—we reject the request.
 We have not attempted to “create an exhaustive list” of
factors that may provide a reason not to extend Bivens,
but we have explained that “central to [this] analysis” are
“separation-of-powers principles.” Abbasi, 582 U. S., at ___
(slip op., at 12). We thus consider the risk of interfering with
8 HERNANDEZ v. MESA

 Opinion of the Court

the authority of the other branches, and we ask whether “there
are sound reasons to think Congress might doubt the effi-
cacy or necessity of a damages remedy,” id., at ___ (slip op.,
at 13), and “whether the Judiciary is well suited, absent
congressional action or instruction, to consider and weigh
the costs and benefits of allowing a damages action to pro-
ceed,” id., at ___ (slip op., at 12).
 III
 A
 The Bivens claims in this case assuredly arise in a new
context. Petitioners contend that their Fourth and Fifth
Amendment claims do not involve a new context because
Bivens and Davis involved claims under those same two
amendments, but that argument rests on a basic misunder-
standing of what our cases mean by a new context. A claim
may arise in a new context even if it is based on the same
constitutional provision as a claim in a case in which a dam-
ages remedy was previously recognized. Compare Carlson,
446 U. S., at 16–18 (allowing Bivens remedy for an Eighth
Amendment claim for failure to provide adequate medical
treatment), with Malesko, 534 U. S., at 71–74 (declining to
create a Bivens remedy in similar circumstances because
the suit was against a private prison operator, not federal
officials). And once we look beyond the constitutional pro-
visions invoked in Bivens, Davis, and the present case, it is
glaringly obvious that petitioners’ claims involve a new con-
text, i.e., one that is meaningfully different. Bivens con-
cerned an allegedly unconstitutional arrest and search car-
ried out in New York City, 403 U. S., at 389; Davis
concerned alleged sex discrimination on Capitol Hill, 442
U. S., at 230. There is a world of difference between those
claims and petitioners’ cross-border shooting claims, where
“the risk of disruptive intrusion by the Judiciary into the
functioning of other branches” is significant. Abbasi, 582
 Cite as: 589 U. S. ____ (2020) 9

 Opinion of the Court

U. S., at ___ (slip op., at 16); see Parts III–B and III–C,
infra.
 Because petitioners assert claims that arise in a new con-
text, we must proceed to the next step and ask whether
there are factors that counsel hesitation. As we will ex-
plain, there are multiple, related factors that raise warning
flags.
 B
 The first is the potential effect on foreign relations. “The
political branches, not the Judiciary, have the responsibil-
ity and institutional capacity to weigh foreign-policy con-
cerns.” Jesner, 584 U. S., at ___ (slip op., at 19). Indeed, we
have said that “matters relating ‘to the conduct of foreign
relations . . . are so exclusively entrusted to the political
branches of government as to be largely immune from judi-
cial inquiry or interference.’ ” Haig v. Agee, 453 U. S. 280,
292 (1981) (quoting Harisiades v. Shaughnessy, 342 U. S.
580, 589 (1952)). “Thus, unless Congress specifically has
provided otherwise, courts traditionally have been reluc-
tant to intrude upon the authority of the Executive in [these
matters].” Department of Navy v. Egan, 484 U. S. 518, 530
(1988). We must therefore be especially wary before allow-
ing a Bivens remedy that impinges on this arena.
 A cross-border shooting is by definition an international
incident; it involves an event that occurs simultaneously in
two countries and affects both countries’ interests. Such an
incident may lead to a disagreement between those coun-
tries, as happened in this case.
 The United States, through the Executive Branch, which
has “ ‘the lead role in foreign policy,’ ” Medellín v. Texas, 552
U. S. 491, 524 (2008) (alteration omitted), has taken the po-
sition that this incident should be handled in a particular
way—namely, that Agent Mesa should not face charges in
the United States nor be extradited to stand trial in Mexico.
As noted, the Executive decided not to take action against
10 HERNANDEZ v. MESA

 Opinion of the Court

Agent Mesa because it found that he “did not act inconsist-
ently with [Border Patrol] policy or training regarding use
of force.” DOJ Press Release. We presume that Border Pa-
trol policy and training incorporate both the Executive’s un-
derstanding of the Fourth Amendment’s prohibition of un-
reasonable seizures and the Executive’s assessment of
circumstances at the border. Thus, the Executive judged
Agent Mesa’s conduct by what it regards as reasonable con-
duct by an agent under the circumstances that Mesa faced
at the time of the shooting, and based on the application of
those standards, it declined to prosecute. The Executive
does not want a Mexican criminal court to judge Agent
Mesa’s conduct by whatever standards would be applicable
under Mexican law; nor does it want a jury in a Bivens ac-
tion to apply its own understanding of what constituted rea-
sonable conduct by a Border Patrol agent under the circum-
stances of this case. Such a jury determination, the
Executive claims, would risk the “ ‘ “embarrassment of our
government abroad” through “multifarious pronounce-
ments by various departments on one question.” ’ ” Brief
for United States as Amicus Curiae 18 (quoting Sanchez-
Espinoza v. Reagan, 770 F. 2d 202, 209 (CADC 1985)
(Scalia, J.)).
 The Government of Mexico has taken a different view of
what should be done. It has requested that Agent Mesa be
extradited for criminal prosecution in a Mexican court un-
der Mexican law, and it has supported petitioners’ Bivens
suit. In a brief filed in this Court, Mexico suggests that
shootings by Border Patrol agents are a persistent problem
and argues that the United States has an obligation under
international law, specifically Article 6(1) of the Interna-
tional Covenant on Civil and Political Rights, Dec. 19, 1966,
S. Treaty Doc. No. 95–20, 999 U. N. T. S. 174, to provide a
remedy for the shooting in this case. Brief for Government
of United Mexican States as Amicus Curiae 2, 20–22. Mex-
ico states that it “has a responsibility to look after the well-
 Cite as: 589 U. S. ____ (2020) 11

 Opinion of the Court

being of its nationals” and that “it is a priority to Mexico to
see that the United States provides adequate means to hold
the agents accountable and to compensate the victims.” Id.,
at 3.
 Both the United States and Mexico have legitimate and
important interests that may be affected by the way in
which this matter is handled. The United States has an
interest in ensuring that agents assigned the difficult and
important task of policing the border are held to standards
and judged by procedures that satisfy United States law
and do not undermine the agents’ effectiveness and morale.
Mexico has an interest in exercising sovereignty over its
territory and in protecting and obtaining justice for its na-
tionals. It is not our task to arbitrate between them.
 In the absence of judicial intervention, the United States
and Mexico would attempt to reconcile their interests
through diplomacy––and that has occurred. The broad is-
sue of violence along the border, the occurrence of cross-
border shootings, and this particular matter have been ad-
dressed through diplomatic channels. In 2014, Mexico and
the United States established a joint Border Violence Pre-
vention Council, and the two countries have addressed
cross-border shootings through the United States-Mexico
bilateral Human Rights Dialogue.2 Following the Justice
Department investigation in the present case, the United

——————
 2 See Dept. of Homeland Security, Written Testimony for House

Comm. on Oversight and Govt. Reform Hearing (Sept. 9, 2015),
https: / / www .dhs.gov/news/2015/09/09/written-testimony-dhs-southern-
border-and-approaches-campaign-joint-task-force-west (discussing crea-
tion of Border Violence Prevention Council); Dept. of Homeland Security,
Border Violence Prevention Council Fact Sheet, https://www.dhs.
gov/sites/default/files/publications/bvpc-fact-sheet.pdf (outlining areas of
collaboration); Dept. of State, Joint Statement on the U. S.-Mexico Bilat-
eral High Level Dialogue on Human Rights (Oct. 27, 2016), https://2009-
2017.state.gov/r/pa/prs/ps/2016/10/263759.htm (noting discussion of “the
use of force at the border”).
12 HERNANDEZ v. MESA

 Opinion of the Court

States reaffirmed its commitment to “work with the Mexi-
can government within existing mechanisms and agree-
ments to prevent future incidents.” DOJ Press Release.
 For these reasons, petitioners’ assertion that their claims
have “nothing to do with the substance or conduct of U. S.
foreign . . . policy,” Brief for Petitioners 29, is plainly
wrong.3
 C
 Petitioners are similarly incorrect in deprecating the
Fifth Circuit’s conclusion that the issue here implicates an
element of national security.
 One of the ways in which the Executive protects this
country is by attempting to control the movement of people
and goods across the border, and that is a daunting task.
The United States’ border with Mexico extends for 1,900
miles, and every day thousands of persons and a large vol-
ume of goods enter this country at ports of entry on the
southern border.4 The lawful passage of people and goods
in both directions across the border is beneficial to both
countries.
 Unfortunately, there is also a large volume of illegal

——————
 3 It is no answer to argue, as Mexico does, that refusing to extend

Bivens “is what [would] negatively affect international relations.” Brief
for Government of United Mexican States as Amicus Curiae 12. When a
third party intervenes and takes sides in a dispute between two coun-
tries, one country is likely to be pleased and the other displeased. But
no matter which side the third party supports, it will have injected itself
into their relations.
 4 See Dept. of Transp., Bureau of Transp. Statistics, Border Crossing/

Entry Data, https://explore.dot.gov/views/BorderCrossingData/Monthly
(detailing the millions of individuals and vehicles that cross the
U. S.-Mexico border each month); U. S. Int’l Trade Comm’n, The Year in
Trade 2018, p. 190 (USITC Pub. No. 4986, 2019) (explaining that in 2018
the United States imported $346.5 billion of goods from Mexico).
 Cite as: 589 U. S. ____ (2020) 13

 Opinion of the Court

cross-border traffic. During the last fiscal year, approxi-
mately 850,000 persons were apprehended attempting to
enter the United States illegally from Mexico,5 and large
quantities of drugs were smuggled across the border.6 In
addition, powerful criminal organizations operating on both
sides of the border present a serious law enforcement prob-
lem for both countries.7
 On the United States’ side, the responsibility for attempt-
ing to prevent the illegal entry of dangerous persons and
goods rests primarily with the U. S. Customs and Border
Protection Agency, and one of its main responsibilities is to
“detect, respond to, and interdict terrorists, drug smugglers
and traffickers, human smugglers and traffickers, and
other persons who may undermine the security of the
United States.” 6 U. S. C. §211(c)(5). While Border Patrol
agents often work miles from the border, some, like Agent
Mesa, are stationed right at the border and have the re-
sponsibility of attempting to prevent illegal entry. For
these reasons, the conduct of agents positioned at the bor-
der has a clear and strong connection to national security,
as the Fifth Circuit understood. 885 F. 3d, at 819.

——————
 5 Dept. of Homeland Security, U. S. Customs and Border Protection,

Southwest Border Migration FY 2019, https://cbp.gov/newsroom/
stats/sw-border-migration/fy-2019.
 6 Dept. of Homeland Security, U. S. Customs and Border Protection,

CBP Enforcement Statistics FY2019, https://cbp.gov/newsroom/
stats/cbp-enforcement-statistics-fy2019 (explaining that in FY2019, Bor-
der Patrol officers seized 11,682 pounds of cocaine, 266,882 pounds of
marijuana, and 14,434 pounds of methamphetamine).
 7 Cong. Research Serv., Mexico: Organized Crime and Drug Trafficking

Organizations, Summary (2019) (“Mexican drug trafficking organiza-
tions . . . pose the greatest crime threat to the United States”); Dept. of
Justice, Drug Enforcement Admin., 2018 National Drug Threat Assess-
ment 97 (DEA–DCT–DIR–032–18) (explaining that “Mexican [transna-
tional criminal organizations] . . . maintain the greatest drug trafficking
influence in the United States”).
14 HERNANDEZ v. MESA

 Opinion of the Court

 Petitioners protest that “ ‘shooting people who are just
walking down a street in Mexico’ ” does not involve national
security, Brief for Petitioners 28, but that misses the point.
The question is not whether national security requires such
conduct––of course, it does not––but whether the Judiciary
should alter the framework established by the political
branches for addressing cases in which it is alleged that le-
thal force was unlawfully employed by an agent at the bor-
der. Cf. Abbasi, 582 U. S., at ___ (slip op., at 19) (explaining
that “[n]ational-security policy is the prerogative of the
Congress and President”).
 We have declined to extend Bivens where doing so would
interfere with the system of military discipline created by
statute and regulation, see Chappell, 462 U. S. 296; Stan-
ley, 483 U. S. 669, and a similar consideration is applicable
here. Since regulating the conduct of agents at the border
unquestionably has national security implications, the risk
of undermining border security provides reason to hesitate
before extending Bivens into this field. See Abbasi, 582
U. S., at ___ (slip op., at 19) (“Judicial inquiry into the
national-security realm raises ‘concerns for the separation
of powers’ ” (quoting Christopher v. Harbury, 536 U. S. 403,
417 (2002))).
 D
 Our reluctance to take that step is reinforced by our sur-
vey of what Congress has done in statutes addressing re-
lated matters. We frequently “loo[k] to analogous statutes
for guidance on the appropriate boundaries of judge-made
causes of action.” Jesner, 584 U. S., at ___ (opinion of Ken-
nedy, J.) (slip op., at 19). When foreign relations are impli-
cated, it “is even more important . . . ‘to look for legislative
guidance before exercising innovative authority over sub-
stantive law.’ ” Id., at ___ (slip op., at 20) (quoting Sosa v.
Alvarez-Machain, 542 U. S. 692, 726 (2004)). Accordingly,
it is “telling,” Abbasi, 582 U. S., at ___ (slip op., at 20), that
 Cite as: 589 U. S. ____ (2020) 15

 Opinion of the Court

Congress has repeatedly declined to authorize the award of
damages for injury inflicted outside our borders.
 A leading example is 42 U. S. C. §1983, which permits the
recovery of damages for constitutional violations by officers
acting under color of state law. We have described Bivens
as a “more limited” “federal analog” to §1983. Hartman v.
Moore, 547 U. S. 250, 254, n. 2 (2006). It is therefore in-
structive that Congress chose to make §1983 available only
to “citizen[s] of the United States or other person[s] within
the jurisdiction thereof.” It would be “anomalous to impute
. . . a judicially implied cause of action beyond the bounds
[Congress has] delineated for [a] comparable express
caus[e] of action.” Blue Chip Stamps v. Manor Drug Stores,
421 U. S. 723, 736 (1975). Thus, the limited scope of §1983
weighs against recognition of the Bivens claim at issue here.
 Section 1983’s express limitation to the claims brought by
citizens and persons subject to United States jurisdiction is
especially significant, but even if this explicit limitation
were lacking, we would presume that §1983 did not apply
abroad. See RJR Nabisco, Inc. v. European Community,
579 U. S. ___, ___ (2016) (slip op., at 7) (“Absent clearly ex-
pressed congressional intent to the contrary, federal laws
will be construed to have only domestic application”). We
presume that statutes do not apply extraterritorially to “en-
sure that the Judiciary does not erroneously adopt an inter-
pretation of U. S. law that carries foreign policy conse-
quences not clearly intended by the political branches.”
Kiobel v. Royal Dutch Petroleum Co., 569 U. S. 108, 116
(2013); see also EEOC v. Arabian American Oil Co., 499
U. S. 244, 248 (1991).
 If this danger provides a reason for caution when Con-
gress has enacted a statute but has not provided expressly
whether it applies abroad, we have even greater reason for
hesitation in deciding whether to extend a judge-made
cause of action beyond our borders. “[T]he danger of unwar-
ranted judicial interference in the conduct of foreign policy
16 HERNANDEZ v. MESA

 Opinion of the Court

is magnified” where “the question is not what Congress has
done but instead what courts may do.” Kiobel, 569 U. S., at
116. Where Congress has not spoken at all, the likelihood
of impinging on its foreign affairs authority is especially
acute.
 Congress’s treatment of ordinary tort claims against fed-
eral officers is also revealing. As petitioners and their amici
stress, the traditional way in which civil litigation ad-
dressed abusive conduct by federal officers was by subject-
ing them to liability for common-law torts. See Brief for
Petitioners 10–17. For many years, such claims could be
raised in state or federal court,8 and this Court occasionally
considered tort suits against federal officers for extraterri-
torial injuries. See, e.g., Mitchell v. Harmony, 13 How. 115
(1852) (affirming award in trespass suit brought by U. S.
citizen against U. S. Army officer who seized personal prop-
erty in Mexico during the Mexican-American war). After
Erie, federal common-law claims were out, but we recog-
nized the continuing viability of state-law tort suits against
federal officials as recently as Westfall v. Erwin, 484 U. S.
292 (1988).
 In response to that decision, Congress passed the so-
called Westfall Act, formally the Federal Employees Liabil-
ity Reform and Tort Compensation Act of 1988, 28 U. S. C.
§2679. That Act makes the Federal Tort Claims Act (FTCA)
“the exclusive remedy for most claims against Government
employees arising out of their official conduct.” Hui v. Cas-
taneda, 559 U. S. 799, 806 (2010).9 Thus, a person injured
——————
 8 State-law claims could be asserted in federal court if the parties’ citi-

zenship was diverse, and federal common-law claims could be raised un-
til Erie R. Co. v. Tompkins, 304 U. S. 64 (1938).
 9 The Act also permits claims “brought for a violation of the Constitu-

tion.” 28 U. S. C. §2679(b)(2)(A). By enacting this provision, Congress
made clear that it was not attempting to abrogate Bivens, but the provi-
sion certainly does not suggest, as one of petitioners’ amici contends, that
 Cite as: 589 U. S. ____ (2020) 17

 Opinion of the Court

by a federal employee may seek recovery directly from the
United States under the FTCA, but the FTCA bars “[a]ny
claim arising in a foreign country.” §2680(k).10 The upshot
is that claims that would otherwise permit the recovery of
damages are barred if the injury occurred abroad.
 Yet another example is provided by the Torture Victim
Protection Act of 1991, note following 28 U. S. C. §1350,
which created a cause of action that may be brought by an
alien in a U. S. court under the Alien Tort Statute, §1350.
Under the Torture Victim Protection Act, a damages action
may be brought by or on behalf of a victim of torture or an
extrajudicial killing carried out by a person who acted un-
der the authority of a foreign state. Consequently, this pro-
vision, which is often employed to seek redress for acts com-
mitted abroad,11 cannot be used to sue a United States
officer. See Meshal v. Higgenbotham, 804 F. 3d 417, 430
(CADC 2015) (Kavanaugh, J., concurring).

——————
Congress “intended for a robust enforcement of Bivens remedies.” Brief
for Institute for Justice as Amicus Curiae 21. Instead, the provision
simply left Bivens where it found it. It is not a license to create a new
Bivens remedy in a context we have never before addressed, see Correc-
tional Services Corp. v. Malesko, 534 U. S. 61, 68 (2001).
 10 Petitioners contend that Congress excluded claims arising abroad in

order to avoid subjecting the United States to liability under foreign law,
something that cannot occur under Bivens. Reply Brief 11. But neither
the legislative history recounted in Sosa v. Alvarez-Machain, 542 U. S.
692, 707 (2004), nor anything else offered by petitioners shows that this
was the only reason for this limitation. And the fact remains that the
FTCA does not permit claims for torts committed abroad, a limitation
that is consistent with Congress’s general practice of avoiding extrater-
ritorial legislation. See, e.g., Kiobel v. Royal Dutch Petroleum Co., 569
U. S. 108, 115–116 (2013).
 11 See, e.g., Samantar v. Yousuf, 560 U. S. 305, 308 (2010) (bringing

claim under the Torture Victim Protection Act against the former First
Vice President and Minister of Defense of Somalia for alleged torture and
extrajudicial killing in Somalia).
18 HERNANDEZ v. MESA

 Opinion of the Court

 These statutes form a pattern that is important for pre-
sent purposes. When Congress has enacted statutes creat-
ing a damages remedy for persons injured by United States
Government officers, it has taken care to preclude claims
for injuries that occurred abroad.
 Instead, when Congress has provided compensation for
injuries suffered by aliens outside the United States, it has
done so by empowering Executive Branch officials to make
payments under circumstances found to be appropriate.
Thus, the Foreign Claims Act, 10 U. S. C. §2734, first en-
acted during World War II, ch. 645, 55 Stat. 880, allows the
Secretary of Defense to appoint claims commissions to set-
tle and pay claims for personal injury and property damage
resulting from the noncombat activities of the Armed
Forces outside this country. §2734(a). Similarly, §2734a
allows the Secretary of Defense and the Secretary of Home-
land Security to make payments pursuant to “an interna-
tional agreement which provides for the settlement or ad-
judication and cost sharing of claims against the United
States” that arise out of “acts or omissions” of the Armed
Forces. §2734a(a); see also 22 U. S. C. §2669(b) (State De-
partment may settle and pay certain claims for death, in-
jury, or property loss or damage “for the purpose of promot-
ing and maintaining friendly relations with foreign
countries”); §2669–1 (Secretary of State has authority to
pay tort claims arising in foreign countries in connection
with State Department operations); 21 U. S. C. §904 (Attor-
ney General has authority to pay tort claims arising in con-
nection with the operations of the Drug Enforcement
Administration abroad).
 This pattern of congressional action—refraining from au-
thorizing damages actions for injury inflicted abroad by
Government officers, while providing alternative avenues
for compensation in some situations—gives us further rea-
son to hesitate about extending Bivens in this case.
 Cite as: 589 U. S. ____ (2020) 19

 Opinion of the Court

 E
 In sum, this case features multiple factors that counsel
hesitation about extending Bivens, but they can all be con-
densed to one concern––respect for the separation of pow-
ers. See Abbasi, 582 U. S., at ___ (slip op., at 12). “Foreign
policy and national security decisions are ‘delicate, com-
plex, and involve large elements of prophecy’ for which ‘the
Judiciary has neither aptitude, facilities[,] nor responsibil-
ity.’ ” Jesner, 584 U. S., at ___ (GORSUCH, J., concurring
part and concurring in judgment) (slip op., at 5) (quoting
Chicago & Southern Air Lines, Inc. v. Waterman S. S. Corp.,
333 U. S. 103, 111 (1948)). To avoid upsetting the delicate
web of international relations, we typically presume that
even congressionally crafted causes of action do not apply
outside our borders. These concerns are only heightened
when judges are asked to fashion constitutional remedies.
Congress, which has authority in the field of foreign affairs,
has chosen not to create liability in similar statutes, leaving
the resolution of extraterritorial claims brought by foreign
nationals to executive officials and the diplomatic process.
 Congress’s decision not to provide a judicial remedy does
not compel us to step into its shoes. “The absence of statu-
tory relief for a constitutional violation . . . does not by any
means necessarily imply that courts should award money
damages against the officers responsible for the violation.”
Schweiker, 487 U. S., at 421–422; see also Stanley, 483
U. S., at 683 (“[I]t is irrelevant to a ‘special factors’ analysis
whether the laws currently on the books afford [plaintiff]
an ‘adequate’ federal remedy for his injuries”).12
 When evaluating whether to extend Bivens, the most im-
portant question “is ‘who should decide’ whether to provide

——————
 12 Indeed, in Abbasi we explained that existence of alternative reme-

dies was merely a further reason not to create Bivens liability. See 582
U. S., at ___ (slip op., at 22) (“[W]hen alternative methods of relief are
available, a Bivens remedy is usually not”).
20 HERNANDEZ v. MESA

 Opinion of the Court

for a damages remedy, Congress or the courts?” Abbasi, 582
U. S., at ___ (slip op., at 12) (quoting Bush, 462 U. S., at
380). The correct “answer most often will be Congress.” 582
U. S., at ___ (slip op., at 12). That is undoubtedly the an-
swer here.
 * * *
 The judgment of the United States Court of Appeals for
the Fifth Circuit is affirmed.
 It is so ordered.
 Cite as: 589 U. S. ____ (2020) 1

 THOMAS, J., concurring

SUPREME COURT OF THE UNITED STATES
 _________________

 No. 17–1678
 _________________

 JESUS C. HERNANDEZ, ET AL., PETITIONERS v.
 JESUS MESA, JR.
 ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
 APPEALS FOR THE FIFTH CIRCUIT
 [February 25, 2020]

 JUSTICE THOMAS, with whom JUSTICE GORSUCH joins,
concurring.
 The Court correctly applies our precedents to conclude
that the implied cause of action created in Bivens v. Six Un-
known Fed. Narcotics Agents, 403 U. S. 388 (1971), should
not be extended to cross-border shootings. I therefore join
its opinion.
 I write separately because, in my view, the time has come
to consider discarding the Bivens doctrine altogether. The
foundation for Bivens—the practice of creating implied
causes of action in the statutory context—has already been
abandoned. And the Court has consistently refused to ex-
tend the Bivens doctrine for nearly 40 years, even going so
far as to suggest that Bivens and its progeny were wrongly
decided. Stare decisis provides no “veneer of respectability
to our continued application of [these] demonstrably incor-
rect precedents.” Gamble v. United States, 587 U. S. ___,
___ (2019) (THOMAS, J., concurring) (slip op., at 2). To en-
sure that we are not “perpetuat[ing] a usurpation of the
legislative power,” id., at ___ (slip op., at 9), we should
reevaluate our continued recognition of even a limited form
of the Bivens doctrine.
 “ ‘Bivens is a relic of the heady days in which this Court
assumed common-law powers to create causes of action.’ ”
Wilkie v. Robbins, 551 U. S. 537, 568 (2007) (THOMAS, J.,
2 HERNANDEZ v. MESA

 THOMAS, J., concurring

concurring) (quoting Correctional Services Corp. v.
Malesko, 534 U. S. 61, 75 (2001) (Scalia, J., concurring)). In
the decade preceding Bivens, the Court believed that it had
a duty “to be alert to provide such remedies as are necessary
to make effective” Congress’ purposes in enacting a statute.
J. I. Case Co. v. Borak, 377 U. S. 426, 433 (1964). Accord-
ingly, the Court freely created implied private causes of ac-
tion for damages under federal statutes. See, e.g., Sullivan
v. Little Hunting Park, Inc., 396 U. S. 229, 239 (1969); Allen
v. State Bd. of Elections, 393 U. S. 544, 557 (1969).
 This misguided approach to implied causes of action in
the statutory context formed the backdrop of the Court’s de-
cision in Bivens. There, the Court held that federal officers
who conducted a warrantless search and arrest in violation
of the Fourth Amendment could be sued for damages.
Bivens, 403 U. S., at 397. The Court acknowledged that
Congress had not provided a statutory cause of action for
damages against federal officers and that “the Fourth
Amendment does not in so many words provide for its en-
forcement by an award of money damages.” Id., at 396–397.
But it concluded, consistent with the then-prevailing un-
derstanding of implied causes of action in the statutory con-
text, that federal courts could infer such a “remedial mech-
anism.” Id., at 397 (citing Borak, 377 U. S., at 433).
 This holding “broke new ground.” Ante, at 4. From the
ratification of the Bill of Rights until 1971, the Court did
not create “implied private action[s] for damages against
federal officers alleged to have violated a citizen’s constitu-
tional rights.” Malesko, 534 U. S., at 66. Suits to recover
such damages were generally brought under state tort law.
See Wheeldin v. Wheeler, 373 U. S. 647, 652 (1963). Bivens
thus opened the door to a new avenue for recovering dam-
ages from federal officers. In the wake of that decision, the
Court recognized an implied cause of action for damages
against a Member of Congress accused of sex discrimination
in violation of the Fifth Amendment’s Due Process Clause,
 Cite as: 589 U. S. ____ (2020) 3

 THOMAS, J., concurring

Davis v. Passman, 442 U. S. 228 (1979), and against prison
officials accused of denying medical care in violation of the
Eighth Amendment’s Cruel and Unusual Punishments
Clause, Carlson v. Green, 446 U. S. 14 (1980). Given this
Court’s trend of creating implied causes of action, “there
was a possibility that the Court would keep expanding
Bivens until it became the substantial equivalent of 42
U. S. C. §1983.” Ziglar v. Abbasi, 582 U. S. ___, ___ (2017)
(slip op., at 8) (internal quotation marks omitted).
 The Court, however, eventually corrected course. In the
statutory context, the Court “retreated from [its] previous
willingness to imply a cause of action where Congress has
not provided one.” Malesko, 534 U. S., at 67, n. 3. After a
series of decisions limiting courts’ discretion to create stat-
utory causes of action, we renounced the Court’s freewheel-
ing approach in Alexander v. Sandoval, 532 U. S. 275
(2001), explicitly repudiating the precedent used to support
Bivens, 532 U. S., at 287 (abrogating Borak, 377 U. S. 426).
We explained that, “[l]ike substantive federal law itself, pri-
vate rights of action to enforce federal law must be created
by Congress.” 532 U. S., at 286. “The judicial task is to
interpret the statute Congress has passed to determine
whether it displays an intent to create not just a private
right but also a private remedy.” Ibid. Without such intent,
“a cause of action does not exist and courts may not create
one, no matter how desirable that might be as a policy mat-
ter, or how compatible with the statute.” Id., at 286–287.
 The Court’s method of implying causes of action for dam-
ages in the statutory context provided the foundation for
the approach taken in Bivens. Therefore, as the Court
backed away from creating statutory causes of action, it
also effectively cabined the Bivens doctrine to the facts of
Bivens, Davis, and Carlson. For nearly 40 years, the Court
has “ ‘consistently refused to extend Bivens liability to any
new context or new category of defendants.’ ” Abbasi, 582
U. S., at ___ (slip op., at 11) (quoting Malesko, 534 U. S., at
4 HERNANDEZ v. MESA

 THOMAS, J., concurring

68); see also ante, at 7.*
 In doing so, our decisions have undermined the validity
of the Bivens doctrine. As the Court recognizes, “[w]e have
stated that expansion of Bivens is a disfavored judicial ac-
tivity.” Ante, at 6–7 (internal quotation marks omitted).
And we have now repeatedly acknowledged the shaky foun-
dation on which Bivens rests, stating that “in light of the
changes to the Court’s general approach to recognizing im-
plied damages remedies, it is possible that the analysis in
the Court’s three Bivens cases might have been different if
they were decided today.” Abbasi, 582 U. S., at ___ (slip op.,
at 10–11); see also ante, at 7 (noting that it is “doubtful that
we would have reached the same result” if Bivens were de-
cided today). Thus, it appears that we have already repu-
diated the foundation of the Bivens doctrine; nothing is left
to do but overrule it.
 Our continued adherence to even a limited form of the
Bivens doctrine appears to “perpetuat[e] a usurpation of the
legislative power.” Gamble, 587 U. S., at ___ (THOMAS, J.,
concurring) (slip op., at 9). Federal courts lack the author-
ity to engage in the distinctly legislative task of creating
causes of action for damages to enforce federal positive law.
We have clearly recognized as much in the statutory con-
text. See supra, at 3. I see no reason for us to take a differ-
ent approach if the right asserted to recover damages de-
rives from the Constitution, rather than from a federal
statute. Either way, we are exercising legislative power
vested in Congress. Cf. Carlson, 446 U. S., at 51
(Rehnquist, J., dissenting) (“The policy questions at issue in

——————
 *See, e.g., ante, at 20; Ziglar v. Abbasi, 582 U. S. ___ (2017); Minneci
v. Pollard, 565 U. S. 118 (2012); Wilkie v. Robbins, 551 U. S. 537 (2007);
Correctional Services Corp. v. Malesko, 534 U. S. 61 (2001); FDIC v.
Meyer, 510 U. S. 471 (1994); Schweiker v. Chilicky, 487 U. S. 412 (1988);
United States v. Stanley, 483 U. S. 669 (1987); Bush v. Lucas, 462 U. S.
367 (1983); Chappell v. Wallace, 462 U. S. 296 (1983).
 Cite as: 589 U. S. ____ (2020) 5

 THOMAS, J., concurring

the creation of any tort remedies, constitutional or other-
wise, involve judgments as to diverse factors that are more
appropriately made by the legislature than by this Court in
an attempt to fashion a constitutional common law”).
 This usurpation of legislative power is all the more trou-
bling because Congress has demonstrated that it knows
how to create a cause of action to recover damages for con-
stitutional violations when it wishes to do so. In 42 U. S. C.
§1983, Congress provided a cause of action that allows per-
sons to recover damages for certain deprivations of consti-
tutional rights by state officers. Congress has chosen not to
provide such a cause of action against federal officers. In
fact, it has pre-empted the state tort suits that traditionally
served as the mechanism by which damages were recovered
from federal officers. 28 U. S. C. §2679(b); Minneci v. Pol-
lard, 565 U. S. 118, 126 (2012). “[I]t is not for us to fill any
hiatus Congress has left in this area.” Wheeldin, 373 U. S.,
at 652.
 * * *
 The analysis underlying Bivens cannot be defended. We
have cabined the doctrine’s scope, undermined its founda-
tion, and limited its precedential value. It is time to correct
this Court’s error and abandon the doctrine altogether.
 Cite as: 589 U. S. ____ (2020) 1

 GINSBURG, J., dissenting

SUPREME COURT OF THE UNITED STATES
 _________________

 No. 17–1678
 _________________

 JESUS C. HERNANDEZ, ET AL., PETITIONERS v.
 JESUS MESA, JR.
 ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
 APPEALS FOR THE FIFTH CIRCUIT
 [February 25, 2020]

 JUSTICE GINSBURG, with whom JUSTICE BREYER,
JUSTICE SOTOMAYOR, and JUSTICE KAGAN join, dissenting.
 In Bivens v. Six Unknown Fed. Narcotics Agents, 403
U. S. 388 (1971), this Court held that injured plaintiffs
could pursue claims for damages against U. S. officers for
conduct disregarding constitutional constraints. The in-
stant suit, invoking Bivens, arose in tragic circumstances.
In 2010, the complaint alleges, a Mexican teenager was
playing with friends in a culvert along the United States-
Mexico border. A U. S. Border Patrol agent, in violation of
instructions controlling his office and situated on the U. S.
side of the border, shot and killed the youth on the Mexican
side. The boy’s parents sued the officer for damages in fed-
eral court, alleging that a rogue federal law enforcement of-
ficer’s unreasonable use of excessive force violated the
Fourth and Fifth Amendments. At the time of the incident,
it is uncontested, the officer did not know whether the boy
he shot was a U. S. national or a citizen of another land.
See Hernández v. Mesa, 582 U. S. ___, ___–___ (2017)
(per curiam) (slip op., at 5–6).
 When the case first reached this Court, the Court re-
manded it, instructing the Court of Appeals to resolve a
threshold question: Is a Bivens remedy available to noncit-
izens (here, the victim’s parents) when the U. S. officer
acted stateside, but the impact of his alleged wrongdoing
2 HERNANDEZ v. MESA

 GINSBURG, J., dissenting

was suffered abroad? To that question, the sole issue now
before this Court, I would answer “yes.” Rogue U. S. officer
conduct falls within a familiar, not a “new,” Bivens setting.
Even if the setting could be characterized as “new,” plain-
tiffs lack recourse to alternative remedies, and no “special
factors” counsel against a Bivens remedy. Neither U. S. for-
eign policy nor national security is in fact endangered by
the litigation. Moreover, concerns attending the applica-
tion of our law to conduct occurring abroad are not involved,
for plaintiffs seek the application of U. S. law to conduct
occurring inside our borders. I would therefore hold that
the plaintiffs’ complaint crosses the Bivens threshold.
 I
 Because this case was resolved on a motion to dismiss, I
accept the complaint’s allegations, next set out, as true. In
2010, Sergio Adrián Hernández Güereca, a 15-year-old cit-
izen of Mexico, was playing with his friends in the dry cul-
vert that divides El Paso, Texas, from Ciudad Juarez, Mex-
ico. The international boundary line runs down the center
of the culvert, but the only visible border-related features
are fences and border-crossing posts that sit atop each side.
See Hernández, 582 U. S., at ___ (BREYER, J., dissenting)
(slip op., at 2). The game Hernández and his friends were
playing involved running up the embankment on the
United States side, touching the barbed-wire fence, and
running back down to the Mexican side. While the game
was ongoing, Border Patrol Agent Jesus Mesa, Jr., ap-
peared on his bicycle and detained one of Hernández’s
friends as he was running down the embankment on the
U. S. side. Hernández, who was unarmed, retreated into
Mexican territory. Mesa pointed his weapon across the bor-
der, “seemingly taking careful aim,” and fired at least two
shots. App. to Pet. for Cert. 199. At least one of the shots
struck Hernández in the face, killing him.
 Cite as: 589 U. S. ____ (2020) 3

 GINSBURG, J., dissenting

 Hernández’s parents brought suit under Bivens, assert-
ing, inter alia, that Mesa had violated their son’s Fourth
and Fifth Amendment rights. The United States District
Court for the Western District of Texas granted Mesa’s mo-
tion to dismiss. A panel of the United States Court of Ap-
peals for the Fifth Circuit affirmed the dismissal of the par-
ents’ Fourth Amendment claim but held that their Fifth
Amendment claim could proceed.
 The Court of Appeals reheard the case en banc and af-
firmed the District Court’s dismissal of the parents’ claims.
The full court agreed with the panel that Hernández lacked
Fourth Amendment rights. Hernandez v. United States,
785 F. 3d 117, 119 (2015) (per curiam) (citing United States
v. Verdugo-Urquidez, 494 U. S. 259 (1990)).1 It declined,
however, to resolve whether Mesa’s conduct violated the
Fifth Amendment, concluding that, in any event, Mesa was
entitled to qualified immunity. 785 F. 3d, at 120–121.
 This Court vacated the Court of Appeals’ judgment and
remanded with several instructions. First, the Court di-
rected the Court of Appeals to address the “antecedent”
question whether the suit could be premised on Bivens in
light of the Court’s recent decision in Ziglar v. Abbasi, 582
U. S. ___, ___ (2017) (slip op., at 1). Hernández, 582 U. S.,
at ___–___ (slip op., at 4–5). The Court also identified error
in the Court of Appeals’ qualified-immunity analysis. Id.,
——————
 1 United States v. Verdugo-Urquidez, 494 U. S. 259 (1990), is not dis-

positive of the Fourth Amendment claim in this case. There, the Court
held that the Fourth Amendment did not apply to federal agents’ war-
rantless search of a Mexican drug trafficker’s home in Mexico. Id., at
262, 274–275. Verdugo-Urquidez’s practical concerns, among them, that
a warrant issued by a U. S. judge “would be a dead letter outside the
United States,” id., at 274, do not bear on the complaint filed by Hernán-
dez’s parents. In contrast to Verdugo-Urquidez, it would not be “imprac-
ticable” or “anomalous” to subject Mesa’s U. S.-based conduct to Fourth
Amendment scrutiny. Boumediene v. Bush, 553 U. S. 723, 759–760
(2008) (quoting Verdugo-Urquidez, 494 U. S., at 278 (Kennedy, J.,
concurring)).
4 HERNANDEZ v. MESA

 GINSBURG, J., dissenting

at ___–___ (slip op., at 5–6). That analysis had centered on
Hernández’s status as an alien with no significant connec-
tions to the United States, but it is “undisputed . . . that
Hernández’s nationality and the extent of his ties to the
United States were unknown to Mesa at the time of the
shooting.” Id., at ___ (slip op., at 6). The Court declined to
address whether Hernández had stated a valid Fourth
Amendment claim. Id., at ___ (slip op., at 5). But see id.,
at ___–___ (BREYER, J., dissenting) (slip op., at 1–7).
 On remand, the Court of Appeals, again sitting en banc,
affirmed the District Court’s dismissal of the suit. The ac-
tion presented a “new context” for Bivens, the court con-
cluded, and special factors counseled its hesitation. 885
F. 3d 811, 816–823 (CA5 2018). Dissenting, Judge Prado
(joined by Judge Graves) urged that the majority had been
“led astray from the familiar circumstances of this case by
empty labels of national security, foreign affairs, and extra-
territoriality.” Id., at 825.
 II
 The plaintiff in Bivens alleged that, during an unjustified
search of his home, rogue federal law enforcement officers
unlawfully seized him, employing “unreasonable force . . .
in making the arrest.” 403 U. S., at 389. This Court af-
forded him a federal damages remedy against the federal
agents who had disregarded the Fourth Amendment’s pro-
hibitions against unreasonable searches and seizures. Id.,
at 390–397. The Court did so directly under the Constitu-
tion, for Congress had provided no statutory claim for relief
to redress the wrongful conduct. See ibid. “Historically,”
the Court observed, “damages have been regarded as the
ordinary remedy for an invasion of personal interests in lib-
erty.” Id., at 395–396. Given the circumstances presented
in Bivens, the Court found “no special factors counselling
hesitation [despite] the absence of affirmative action by
Congress.” Id., at 396. Justice Harlan concurred in the
 Cite as: 589 U. S. ____ (2020) 5

 GINSBURG, J., dissenting

judgment, emphasizing that damages were “the only possi-
ble remedy for someone in [the plaintiff ’s] alleged position.”
Id., at 409–410 (injunctions could not “obviate the harm”
done, the United States was “immune to suit,” and the ex-
clusionary rule was “irrelevant” for those “innocen[t] of the
crime charged”).
 The Court has extended Bivens twice. See Davis v. Pass-
man, 442 U. S. 228 (1979) (sex-discrimination claim against
a congressman under the Fifth Amendment’s Due Process
Clause); Carlson v. Green, 446 U. S. 14 (1980) (inadequate
medical treatment claim against federal prison officials un-
der the Eighth Amendment). Though the Court has more
recently declined to extend Bivens to new contexts, see Ab-
basi, 582 U. S., at ___–___ (slip op., at 11–12), Bivens re-
mains the law of the land in settings in which the decision
has been held to apply, see Abbasi, 582 U. S., at ___ (slip
op., at 11).
 In Abbasi, former immigration detainees alleged mis-
treatment and discrimination following the September 11,
2001 terrorist attacks. Id., at ___–___ (slip op., at 3–5). In-
voking Bivens, the plaintiffs sued the former Attorney Gen-
eral, Federal Bureau of Investigation Director, and Immi-
gration and Naturalization Service Commissioner, as well
as detention-facility wardens, under the Fourth and Fifth
Amendments. 582 U. S., at ___ (slip op., at 5). Though rec-
ognizing that one of the plaintiffs’ Bivens claims might be
viable, 582 U. S., at ___–___ (slip op., at 23–26),2 the Court
held that the other claims could not proceed under Bivens.
A lawsuit challenging “a high-level executive policy” framed
in response to “a major terrorist attack,” the Court ob-

——————
 2 The detainees had alleged, inter alia, that one of the wardens violated

the Fifth Amendment by allowing prison guards to abuse them. Ziglar
v. Abbasi, 582 U. S. ___, ___ (2017) (slip op., at 23). The Court remanded
this claim for the Court of Appeals to conduct a special-factors analysis
in the first instance. Id., at ___ (slip op., at 26).
6 HERNANDEZ v. MESA

 GINSBURG, J., dissenting

served, bore “little resemblance to” previous Bivens set-
tings. 582 U. S., at ___–___ (slip op., at 16–17). As consid-
erations counseling hesitation to extend Bivens to the set-
ting in Abbasi, the Court stressed the impropriety of using
Bivens to challenge governmental policies, the risk of judi-
cial disruption of national security decision-making, and
the availability of alternative remedies. 582 U. S., at ___–
___ (slip op., at 17–23).
 Concerning future invocations of Bivens, Abbasi provided
several guides. On whether a case presents a new Bivens
context, the Court stated: “If the case is different in a mean-
ingful way from previous Bivens cases decided by this
Court, then the context is new.” 582 U. S., at ___ (slip op.,
at 16). And on whether to extend Bivens to a new context,
Abbasi identified as the critical inquiry: Is “the Judiciary
. . . well suited, absent congressional action or instruction,
to consider and weigh the costs and benefits of allowing a
damages action to proceed”? 582 U. S., at ___ (slip op.,
at 12).
 While reining in this Court’s Bivens jurisprudence, the
Court cautioned in Abbasi that its “opinion is not intended
to cast doubt on the continued force, or even the necessity,
of Bivens in the search-and-seizure context in which it
arose.” 582 U. S., at ___ (slip op., at 11). “The settled law
of Bivens in this common and recurrent sphere of law en-
forcement, and the undoubted reliance upon it as a fixed
principle in the law, are powerful reasons to retain it in that
sphere.” Ibid. The Court also reiterated that suits against
“the individual official for his or her own acts” deter behav-
ior incompatible with constitutional norms, a consideration
key to the Bivens decision. 582 U. S., at ___ (slip op., at 17)
(emphasis added). “[I]ndividual instances of . . . law en-
forcement overreach,” the Court recognized, are by “their
very nature . . . difficult to address except by way of dam-
ages actions after the fact.” Id., at ___ (slip op., at 21) (em-
phasis added).
 Cite as: 589 U. S. ____ (2020) 7

 GINSBURG, J., dissenting

 III
 Plaintiffs’ Bivens action arises in a setting kin to Bivens
itself: Mesa, plaintiffs allege, acted in disregard of instruc-
tions governing his conduct and of Hernández’s constitu-
tional rights. Abbasi acknowledged the “fixed principle”
that plaintiffs may bring Bivens suits against federal law
enforcement officers for “seizure[s]” that violate the Fourth
Amendment. 582 U. S., at ___ (slip op., at 11); supra, at 6.3
Using lethal force against a person who “poses no immedi-
ate threat to the officer and no threat to others” surely qual-
ifies as an unreasonable seizure. Tennessee v. Garner, 471
U. S. 1, 11 (1985). The complaint states that Mesa engaged
in that very conduct; it alleged, specifically, that Hernández
was unarmed and posed no threat to Mesa or others. For
these reasons, as Mesa acknowledged at oral argument,
Hernández’s parents could have maintained a Bivens action
had the bullet hit Hernández while he was running up or
down the United States side of the embankment. See Tr. of
Oral Arg. 50.
 The only salient difference here: the fortuity that the bul-
let happened to strike Hernández on the Mexican side of
the embankment. But Hernández’s location at the precise
moment the bullet landed should not matter one whit. Af-
ter all, “[t]he purpose of Bivens is to deter the officer.” Ab-
basi, 582 U. S., at ___ (slip op., at 17) (internal quotation
——————
 3 Unlike Abbasi, this case does not meaningfully differ from Bivens v.

Six Unknown Fed. Narcotics Agents, 403 U. S. 388 (1971), with respect
to the “rank of the officers involved; the constitutional right at issue; the
generality or specificity of the official action; the extent of judicial guid-
ance as to how an officer should respond to the problem or emergency to
be confronted; [or] the statutory or other legal mandate under which the
officer was operating.” Abbasi, 582 U. S., at ___ (slip op., at 16). As dif-
ferences material to a new-context determination, Abbasi also lists: “the
risk of disruptive intrusion by the Judiciary into the functioning of other
branches . . . or the presence of potential special factors that previous
Bivens cases did not consider.” Ibid. These considerations overlap with
the special-factors inquiry to which I turn in Part IV.
8 HERNANDEZ v. MESA

 GINSBURG, J., dissenting

marks omitted); supra, at 6. And primary conduct con-
strained by the Fourth Amendment is an officer’s unjusti-
fied resort to excessive force. See Garner, 471 U. S., at 20–
22. Mesa’s allegedly unwarranted deployment of deadly
force occurred on United States soil. It scarcely makes
sense for a remedy trained on deterring rogue officer con-
duct to turn upon a happenstance subsequent to the con-
duct—a bullet landing in one half of a culvert, not the other.
 Nor would it make sense to deem some culvert locations
“new settings” for Bivens purposes, but others (those inside
the United States), familiar territory. As recounted in
JUSTICE BREYER’s dissent earlier in this litigation, the cul-
vert “does not itself contain any physical features of a bor-
der”; it consists of wide swaths of “concrete-lined empty
space” with fencing on each side. Hernández, 582 U. S., at
___ (slip op., at 2). See also id., at ___ (slip op., at 5) (noting
“the near irrelevance of [the] midculvert line . . . for most
border-related purposes”). It is not asserted that Mesa
“knew on which side of the boundary line [his] bullet would
land.” Id., at ___ (slip op., at 2).
 Finally, although the bullet happened to land on the Mex-
ican side of the culvert, the United States, as in Bivens, un-
questionably has jurisdiction to prescribe law governing a
Border Patrol agent’s conduct. That prescriptive jurisdic-
tion reaches “conduct that . . . takes place within [United
States] territory.” Restatement (Third) of Foreign Rela-
tions Law of the United States §402 (1986). The place of a
rogue officer’s conduct “has peculiar significance” to choice
of the applicable law where, as here, “the primary purpose
of the tort rule involved is to deter or punish misconduct.”
Restatement (Second) of Conflict of Laws §145, Comment e,
p. 420 (1969).4
——————
 4 The Court of Appeals typed the setting of this case “new” because it

was unsure whether the asserted constitutional rights extended “to for-
eign citizens on foreign soil.” 885 F. 3d 811, 817 (CA5 2018). But that
question is appropriately addressed in deciding this case on the merits.
 Cite as: 589 U. S. ____ (2020) 9

 GINSBURG, J., dissenting

 IV
 Even accepting, arguendo, that the setting in this case
could be characterized as “new,” there is still no good reason
why Hernández’s parents should face a closed courtroom
door. As in Bivens, plaintiffs lack recourse to alternative
remedies. And not one of the “special factors” the Court
identifies weigh any differently based on where a bullet
happens to land.
 A
 It was “of central importance” to the Court’s disposition
in Abbasi that the case was “[un]like Bivens . . . in which ‘it
[was] damages or nothing.’ ” 582 U. S., at ___ (slip op., at
21) (quoting Bivens, 403 U. S., at 410 (Harlan, J., concur-
ring in judgment)). Here, as Judge Prado, dissenting below,
observed, “[i]t is uncontested that plaintiffs find no alterna-
tive relief in Mexican law, state law, the Federal Tort
Claims Act (‘FTCA’), the Alien Tort Statute (‘ATS’), or fed-
eral criminal law.” 885 F. 3d, at 827. While the absence of
alternative remedies, standing alone, does not warrant a
Bivens action, cf. ante, at 19, it remains a significant con-
sideration under Abbasi’s guidelines.
 B
 The special factors featured by the Court relate, in the
main, to foreign policy and national security. But, as sug-
gested earlier, see supra, at 7, no policies or policymakers
are challenged in this case. Plaintiffs target the rogue ac-
tions of a rank-and-file law enforcement officer acting in
violation of rules controlling his office. See 8 CFR

——————
The Court of Appeals’ uncertainty does not mean a claim arises in a
“new” context for Bivens purposes, for “[t]here will always be at least
some uncertainty as to whether[, once factual allegations are tested at
trial,] a plaintiff is ultimately going to prevail on his constitutional
claims.” Brief for Petitioners 24.
10 HERNANDEZ v. MESA

 GINSBURG, J., dissenting

§287.8(a)(2)(ii) (2019) (limiting use of deadly force). The sit-
uation here presented resembles cases Abbasi distin-
guished—cases involving “individual instances of . . . law
enforcement overreach.” 582 U. S., at ___ (slip op., at 21).
 The Court nevertheless asserts that the instant suit has
a “potential effect on foreign relations” because it invites
courts “to arbitrate between” the United States and Mexico.
Ante, at 9, 11. Plaintiffs, however, have brought a civil
damages action, no different from one a federal court would
entertain had the fatal shot hit Hernández before he
reached the Mexican side of the border. True, cross-border
shootings spark bilateral discussion, but so too does a range
of smuggling and other border-related issues that courts
routinely address “concurrently with whatever diplomacy
may also be addressing them.” Rodriguez v. Swartz, 899
F. 3d 719, 747 (CA9 2018). The Government has identified
no deleterious effect on diplomatic negotiations in any case
after the Ninth Circuit held that the mother of a boy killed
in a cross-border shooting could institute a Bivens action.
See 899 F. 3d, at 734.
 Moreover, the Court, in this case, cannot escape a “poten-
tial effect on foreign relations,” ante, at 9, by declining to
recognize a Bivens action. As the Mexican Government
alerted the Court: “[R]efus[al] to consider [Hernández’s]
parents’ claim on the merits . . . is what has the potential to
negatively affect international relations.” Brief for Govern-
ment of the United Mexican States as Amicus Curiae 12.
 Notably, recognizing a Bivens suit here honors our Na-
tion’s international commitments. Article 9(5) of the Inter-
national Covenant on Civil and Political Rights (ICCPR),
Dec. 19, 1966, S. Treaty Doc. No. 95–20, 999 U. N. T. S. 176,
provides that “[a]nyone who has been the victim of unlawful
arrest or detention shall have an enforceable right to com-
pensation.” The United States ratified the ICCPR with the
“understandin[g]” that Article 9(5) “require[s] the provision
of effective and enforceable mechanisms by which a victim
 Cite as: 589 U. S. ____ (2020) 11

 GINSBURG, J., dissenting

of an unlawful arrest or detention or a miscarriage of justice
may seek and, where justified, obtain compensation from
either the responsible individual or the appropriate govern-
mental entity.” U. S. Reservations, Declarations, and Un-
derstandings, ICCPR, 138 Cong. Rec. 8071 (1992). See also
1676 U. N. T. S. 544 (entered into force Sept. 8, 1992). One
fitting mechanism to obtain compensation is a Bivens ac-
tion. See Senate Committee on Foreign Relations, ICCPR,
S. Exec. Rep. No. 102–23, p. 15 (1992).
 The Court also asserts, as cause for hesitation, “the risk
of undermining border security.” Ante, at 14. But the Court
speaks with generality of the national-security involvement
of Border Patrol officers. It does not home in on how a
Bivens suit for an unjustified killing would in fact under-
mine security at the border. Abbasi cautioned against in-
vocations of national security of this very order: “[N]ational-
security concerns must not become a talisman used to ward
off inconvenient claims—a ‘label’ used to ‘cover a multitude
of sins.’ ” 582 U. S., at ___ (slip op., at 20) (quoting Mitchell
v. Forsyth, 472 U. S. 511, 523 (1985)). Instructions regulat-
ing Border Patrol agents tell them to guard against deploy-
ing unjustified deadly force. See 8 CFR §287.8(a)(2)(ii).
Given that instruction, I do not grasp how allowing a Bivens
action here would intrude upon the political branches’
national-security prerogatives.
 Congress, although well aware of the Court’s opinion in
Bivens, see, e.g., S. Exec. Rep. No. 102–23, at 15, has not
endeavored to dislodge the decision. The Court cites several
statutes in support of the argument that affording a Bivens
action to Hernández’s parents would be inconsistent with
measures Congress has taken. None of the cited statutes
should stand in plaintiffs’ way.
 Section 1983 actions, the Court points out, are available
only to “person[s] within the jurisdiction” of the United
12 HERNANDEZ v. MESA

 GINSBURG, J., dissenting

States. 42 U. S. C. §1983.5 That statute has, as its prove-
nance, Reconstruction-era policies aiming to secure to for-
mer slaves federal rights and to ward off state and local in-
cursion on those rights. See Mitchum v. Foster, 407 U. S.
225, 238–239, and n. 30 (1972). “It is inconceivable that . . .
Congress [then] thought about (and deliberately excluded
liability for) cross-border incidents involving federal offi-
cials.” Rodriguez, 899 F. 3d, at 742.
 The FTCA is also inapposite. Its exclusion of “claim[s]
arising in a foreign country,” 28 U. S. C. §2680(k), reflects
“Congress’s ‘unwilling[ness] to subject the United States to
liabilities depending upon the laws of a foreign power.’ ”
Sosa v. Alvarez-Machain, 542 U. S. 692, 707 (2004) (quoting
United States v. Spelar, 338 U. S. 217, 221 (1949)). Here,
however, the suit arises under U. S. law. Even as the West-
fall Act amended the FTCA to make it the “exclusive” rem-
edy for scope-of-employment claims against Government of-
ficers, §2679(b)(1), Congress carved out an exception for
Bivens suits, §2679(b)(2)(A) (excepting civil claims “brought
for a violation of the Constitution of the United States”).
The Torture Victim Protection Act of 1991 applies exclu-
sively to wrongdoers acting under color of foreign law. 28
U. S. C. §1350 Note. The conduct of federal and state offic-
ers is outside that Act’s purview.6
——————
 5 Title 42 U. S. C. §1983 reads: “Every person who, under color of any

statute, ordinance, regulation, custom, or usage, of any State or Territory
or the District of Columbia, subjects, or causes to be subjected, any citi-
zen of the United States or other person within the jurisdiction thereof
to the deprivation of any rights, privileges, or immunities secured by the
Constitution and laws, shall be liable to the party injured in an action at
law, suit in equity, or other proper proceeding for redress.”
 6 The Torture Victim Protection Act sought to codify a Second Circuit

opinion recognizing “a right of action against foreign torturers” under the
Alien Tort Claims Act. H. R. Rep. No. 102–367, pp. 3–4 (1991) (discuss-
ing Filartiga v. Pena-Irala, 630 F. 2d 876 (CA2 1980)). “Domestic offi-
cials were not at issue.” Rodriguez v. Swartz, 899 F. 3d 719, 743 (CA9
2018).
 Cite as: 589 U. S. ____ (2020) 13

 GINSBURG, J., dissenting

 Nor are concerns sometimes attending application of our
law abroad implicated in this case. True, the Court has ap-
plied a “presumption against extraterritorial application”
to statutes that do not make plain their governance beyond
U. S. borders. Kiobel v. Royal Dutch Petroleum Co., 569
U. S. 108, 115 (2013). But plaintiffs in this case allege a
tort stemming from stateside conduct. Cf. id., at 124–125
(if conduct at issue “touch[es] and concern[s] the territory
of the United States . . . with sufficient force,” the presump-
tion against extraterritoriality is displaced). This case
scarcely resembles those in which applying “U. S. law . . . to
conduct in foreign countries” might spark “international
discord.” RJR Nabisco, Inc. v. European Community, 579
U. S. ___, ___–___ (2016) (slip op., at 7–8). Quite the oppo-
site. Withholding a Bivens suit here threatens to exacer-
bate bilateral relations, see supra, at 10, and in no way fos-
ters our international commitments, see supra, at 10–11.
 V
 Regrettably, the death of Hernández is not an isolated in-
cident. Cf. Rodriguez, 899 F. 3d, at 727 (complaint alleged
that border agent fired 14 to 30 bullets across the border,
killing a 16-year-old boy); Brief for Immigrant and Civil
Rights Organizations as Amici Curiae 26–28 (describing
various incidents of allegedly unconstitutional conduct by
border and immigration officers); Brief for Border Network
for Human Rights et al. as Amici Curiae 8–15 (listing indi-
viduals killed by border agents). One report reviewed over
800 complaints of alleged physical, verbal, or sexual abuse
lodged against Border Patrol agents between 2009 and
2012; in 97% of the complaints resulting in formal deci-
sions, no action was taken. D. Martínez, G. Cantor, & W.
Ewing, No Action Taken: Lack of CBP Accountability in Re-
sponding to Complaints of Abuse, American Immigration
Council 1–8 (2014), americanimmigrationcouncil.org/sites/
14 HERNANDEZ v. MESA

 GINSBURG, J., dissenting

default/files/research/No%20Action%20Taken_Final.pdf. Ac-
cording to amici former Customs and Border Protection of-
ficials, “the United States has not extradited a Border Pa-
trol agent to stand trial in Mexico, and to [amici’s]
knowledge has itself prosecuted only one agent in a cross-
border shooting.” Brief for Former Officials of U. S. Cus-
toms and Border Protection Agency as Amici Curiae 4.
These amici warn that, “[w]ithout the possibility of civil li-
ability, the unlikely prospect of discipline or criminal pros-
ecution will not provide a meaningful deterrent to abuse at
the border.” Ibid. In short, it is all too apparent that to
redress injuries like the one suffered here, it is Bivens or
nothing.
 * * *
 I resist the conclusion that “nothing” is the answer re-
quired in this case. I would reverse the Fifth Circuit’s judg-
ment and hold that plaintiffs can sue Mesa in federal court
for violating their son’s Fourth and Fifth Amendment
rights.