**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────

**No. 23-6246**

─────────

ANDREW FIELDS, III,

Plaintiff - Appellant,

v.

FEDERAL BUREAU OF PRISONS; WARDEN STREEVAL; A. W. GOLDEY;
CAPTAIN BAKER; MITCHELL; MULLINS; NEFF; EWING; GAYHEART;
SESSIONS; FIELDS; SLOAN; NURSE SCOTT; J. ROBBINS; BOLLING;
GARRETT; SCHOLL; GILBERT; BAKER; BARKER; FARMER; DICKENSON;
LIEUTENANT LAFFIN; LIEUTENANT NICHOLOUS; LIEUTENANT HAMILTON;
LIEUTENANT MULLINS; HUGHES; LASTER,

Defendants - Appellees.

─────────

Appeal from the United States District Court for the Western District of Virginia, at
Roanoke.  Elizabeth Kay Dillon, District Judge.  (7:22-cv-00021-EKD-JCH)

─────────

Argued:  January 26, 2024                          Decided:  July 25, 2024

─────────

Before GREGORY, THACKER, and RICHARDSON, Circuit Judges.

─────────

Affirmed in part, reversed in part, and remanded by published opinion.  Judge Gregory
wrote the opinion, in which Judge Thacker joined.  Judge Richardson wrote a dissenting
opinion.

─────────

**ARGUED:**  Daniel Zemel, THE KRUDYS LAW FIRM, PLC, Richmond, Virginia, for
Appellant.  Krista Consiglio Frith, OFFICE OF THE UNITED STATES ATTORNEY,

Roanoke, Virginia, for Appellee. **ON BRIEF:** John F. Preis, Professor of Law, THE UNIVERSITY OF RICHMOND SCHOOL OF LAW, Richmond, Virginia, for Appellant. Christopher R. Kavanaugh, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia, for Appellee.

GREGORY, Circuit Judge:

While incarcerated at U.S. Penitentiary (USP) Lee, Andrew Fields was the target of egregious physical abuse. There is little doubt that Fields would have a viable § 1983 claim against prison officials if he had been incarcerated at a state prison. But Fields was at a federal facility, and claims against federal officials for constitutional violations are severely limited under established precedent. Thus, the district court concluded that Fields cannot obtain relief and that his claim must be dismissed pursuant to the Prison Litigation Reform Act's prescreening procedure. Though we acknowledge the limited availability of claims under *Bivens v. Six Unknown Named Agents of Federal Narcotics Bureau* against federal officials, including officers in federal prisons, we conclude that Fields can overcome those limitations and successfully state a claim against the officers. Accordingly, we reverse.

## I.

We review de novo a district court's dismissal through PLRA prescreening for failure to state a claim. *Moore v. Bennette*, 517 F.3d 717, 728 (4th Cir. 2008). In so doing, we apply the same standard as under Rule 12(b)(6). *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002). We accept all facts pled in the Complaint as true and "draw all reasonable inferences in favor of the plaintiff." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). Because the complaint in this case was filed pro se, we construe the allegations "liberally" in the plaintiff's favor. *Shaw v. Foreman*, 59 F.4th 121, 126 (4th Cir. 2023).

3

II.

Fields alleges that he was the victim of excessive force, inflicted by several prison officials at USP Lee in violation of the Eighth Amendment. Specifically, he alleges that on November 10, 2021, he went to lunch without his inmate movement pass, which he was required to carry with him whenever he left his housing unit. J.A. 9. Upon his return, he was escorted to USP Lee's lieutenants' office, where he was berated for failing to carry his inmate movement pass with him at all times. J.A. 10–11. He was then ordered to be taken to the special housing unit (SHU), colloquially known as "the hole," and placed in administrative segregation. J.A. 11. Before he was taken to the SHU, an officer conducted a pat down search and seized several legal documents Fields had on his person and Fields's prescription eyeglasses. J.A. 12. To date, neither the documents nor the eyeglasses have been returned. *Id.*

On the way to the SHU, a scuffle erupted. J.A. 13. According to an incident report appended to the complaint, Fields allegedly tried to assault the officers escorting him. J.A. 29. As a result of this incident, Fields was placed in ambulatory restraints and taken the rest of the way to the SHU in a wheelchair. J.A. 13. This is the first alleged incident of excessive force, though Appellees argue that the officers' actions were justified because Fields initiated the scuffle.

Once at the SHU, Fields was placed in an observation cell. J.A. 14. At regular intervals, prison staff were required to check on Fields. Despite the fact that Fields was still in restraints with both his hands and feet cuffed, the officers used each check as another opportunity to physically abuse Fields, including by ramming his head into the concrete

4

cell wall and hitting Fields with a fiberglass security shield. J.A. 14. There is no allegation that Fields posed a physical threat to the officers during any of these checks. J.A. 14–23. Fields alleges that this entire sequence of events was retaliation for his involvement in an unrelated proceeding concerning events that occurred at a different federal prison. J.A. 9.

Following his time in the SHU, Fields attempted to utilize the Bureau of Prisons' (BOP's) administrative grievance procedure, but prison staff denied him access to the necessary forms. J.A. 24, 26. He was thus unable to pursue any alternative remedies. J.A. 26. After unsuccessfully attempting to access the available administrative remedies, Fields filed a pro se civil rights complaint in the United States District Court for the Western District of Virginia. The suit named the BOP, the prison warden, and several other officers, both supervisory and those who directly interacted with Fields during the events giving rise to this case.

The district court prescreened the complaint pursuant to 28 U.S.C. § 1915A(b). That provision of the Prison Litigation Reform Act (PLRA) requires courts "as soon as practicable after docketing" to review civil cases "in which a prisoner seeks redress from a governmental entity or officer" and "dismiss the complaint, or any portion of the complaint" that "is frivolous, malicious, or fails to state a claim upon which relief may be granted." § 1915A(b). The district court dismissed the complaint in full because, it said, many of its allegations failed to state a constitutional violation and even those that did were not cognizable because "there is no damages remedy under *Bivens*" for those claims. J.A. 96.

Fields appealed the dismissal and has since retained counsel. On appeal, he challenges only the dismissal of his Eighth Amendment excessive force claim. He

5

concedes that this case arises in a new context under our *Bivens* analysis but argues that *Bivens* should nonetheless be extended to permit him to pursue this claim. He does not challenge the dismissal of any of the other claims originally brought in his complaint.

III.

"Although § 1983 gives plaintiffs the statutory authority to sue *state* officials for money damages for constitutional violations, there is no statutory counterpart to sue federal officials." *Mays v. Smith*, 70 F.4th 198, 201 (4th Cir. 2023). If they are to proceed at all, plaintiffs suing federal-officer defendants must proceed under an implied cause of action first established by the Supreme Court in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*. 403 U.S. 388 (1971). To date, the Supreme Court has recognized a *Bivens* cause of action in only three circumstances. In *Bivens* itself, the Supreme Court recognized an implied cause of action against six Federal Bureau of Narcotics agents in their individual capacities. *See generally id.* The agents had shackled the defendant in front of his family, threatened to arrest his entire family, searched his apartment without a search warrant, and arrested him for alleged narcotics violations without a warrant or probable cause. *Id.* at 389. The Supreme Court found an implied cause of action for damages for the alleged Fourth Amendment violation. *Id.* at 390–98. In *Davis v. Passman*, the Supreme Court extended *Bivens* to create an implied cause of action under the Fifth Amendment's Due Process Clause, which prohibits the federal government from denying anyone the equal protection of the law. 442 U.S. 228, 236 (1979). Specifically, it found a cause of action against a congressman for firing his female secretary. *Id.* at 234. Finally,

6

in *Carlson v. Green*, the Supreme Court allowed a prisoner's estate to sue BOP officials for violating the inmate's Eighth Amendment rights by failing to treat the prisoner's asthma. 446 U.S. 14 (1980). The latter is akin to a § 1983 claim for Eighth Amendment deliberate indifference to medical needs.

Since these decisions were handed down, the tide has turned against *Bivens*. "The [Supreme] Court has made clear that expanding the *Bivens* remedy to a new context is an extraordinary act that will be unavailable in most every case." *Mays*, 70 F.4th at 202. And in the Supreme Court's most recent *Bivens* decision, *Egbert v. Boule*, 596 U.S. 482 (2022), "the Supreme Court all but closed the door on *Bivens* remedies." *Dyer v. Smith*, 56 F.4th 271, 277 (4th Cir. 2022). It emphasized that "we have come 'to appreciate more fully the tension between' judicially created causes of action and 'the Constitution's separation of legislative and judicial power.'" *Egbert*, 596 U.S. at 491 (quoting *Hernandez v. Mesa*, 140 S. Ct. 735, 741 (2020)). Thus, the *Egbert* court asserted that "recognizing a cause of action under *Bivens* is 'a disfavored judicial activity,'" but chose not to dispense with *Bivens* altogether. *Id.* (quoting *Ziglar v. Abassi*, 582 U.S. 120, 121 (2017)).

## A.

To determine whether a plaintiff's claim may proceed under *Bivens*, we conduct a two-step analysis:

> First, we ask whether the case presents a new *Bivens* context—*i.e.*, is it meaningfully different from the three cases in which the Court has implied a damages action. Second, if the claim arises in a new context, a *Bivens* remedy is unavailable if there are special factors indicating that the Judiciary is at least arguably less equipped than Congress to weigh the costs and benefits of allowing a damages action to proceed. If there is even a single

7

reason to pause before applying *Bivens* in a new context, a court may not recognize a *Bivens* remedy.

*Egbert*, 596 U.S. at 492 (internal quotations omitted).

With respect to the first step, the Supreme Court has counseled that "[a] claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized." *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020). "A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider." *Ziglar v. Abassi*, 582 U.S. 120, 139–40 (2017).

Fields concedes that this case arises in a new context.[1] We are thus faced solely with step two and must determine "whether there is any reason to think that Congress might be better equipped to create a damages remedy" for Fields's excessive force claim. "Put another way, the most important question is who should decide whether to provide for a damages remedy, Congress or the courts?" *Egbert*, 596 U.S. at 491–92 (internal quotation omitted).

---

[1] It is perhaps arguable that this case arises in the same context as *Carlson*. Like this case, *Carlson* was a suit against prison officials whose individual conduct threatened the health of an inmate. But because Fields concedes that his case arises in a new context, he has waived that argument. *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief or by failing to develop its argument—even if its brief takes a passing shot at the issue." (cleaned up)).

B.

Since *Egbert*, this Court has declined to extend *Bivens* in a number of cases brought by federal prison inmates against BOP officials. In these cases, we concluded that many of the same special factors counseled against extending *Bivens*: (1) Congress's decision to omit an individual capacity damages remedy from the Prison Litigation Reform Act (PLRA); (2) the existence of alternative remedies; and (3) the potential for systemwide consequences.

We have given great weight to Congress's decision to omit an individual-capacity damages remedy from the PLRA because separation of powers is a central concern in deciding whether to extend *Bivens*. That decision, we said, "speaks volumes and counsels strongly against judicial usurpation of the legislative function." *Bulger v. Hurwitz*, 62 F.th 127, 141 (4th Cir. 2023) (declining to extend *Bivens* to an inmate's Eighth Amendment claims that BOP officials failed to protect him against attack by fellow inmates and transferred him to a "violent" facility); *Mays*, 70 F.4th at 206 (declining to extend *Bivens* to an inmate's Fifth Amendment equal protection and due process claims stemming from alleged racial discrimination by the inmate's supervisor in the BOP's employment program).

Relatedly, because courts "may not fashion a *Bivens* remedy if Congress has already provided, or has authorized the Executive to provide, 'an alternative remedial structure,'" *Egbert*, 596 U.S. at 493 (quoting *Ziglar*, 582 U.S. at 137), our prior cases pointed to the BOP's Administrative Remedy Program (ARP) as another factor counseling against extending *Bivens*. We have said that the existence of an alternative remedial scheme prevents us from extending *Bivens*, even when that scheme does "not provide complete relief." *Tate v. Harmon*, 54 F.4th 839, 847 (4th Cir. 2022) (quoting *Egbert*, 596 U.S. at

9

493).  That is true even when the alternate remedies cannot provide a form of relief that would be available in court.  *See Earle v. Shreves*, 990 F.3d 774, 777 (4th Cir. 2021) ("While these alternate remedies do not permit an award of money damages, they nonetheless offer the possibility of meaningful relief and therefore remain relevant to our analysis."); *Schweiker v. Chilicky*, 487 U.S. 412, 425 (1988) (declining to imply a Bivens remedy for due process claims arising from the denial of Social Security benefits despite the unavailability of compensatory damages under an alternate remedial scheme).  Finally, we have noted that "[t]he potential unavailability of a remedy in a particular circumstance does not warrant supplementing that scheme."  *Bulger*, 62 F.4th at 141 (declining to extend *Bivens* in part because of the ARP despite the fact that the inmate "did not have enough time to avail himself of the remedies offered by the ARP before his transfer to [a different facility] or before he was killed").

Our precedents also point to the potential for systemwide consequences that may result from extending *Bivens*.  Allowing "broad-based, systemic claim[s] against an array of federal officials," we said, would risk "expand[ing] prison officials' liability from previous *Bivens* actions to systemic levels, potentially affecting not only the scope of their responsibilities and duties but also their administrative and economic decisions."  *Tate*, 54 F.4th at 846.  In contrast to the claims in *Carlson* (that the prison officials were deliberately indifferent when they failed to treat the inmate's asthma), which were "narrow and discrete," and thus "implicat[ed] well-established criteria for liability and damages," *id.*, claims based on conditions of confinement, *see Tate*, 54 F.4th at 841, failure to protect by moving an inmate to a "violent facility," *see Bulger*, 54 F.4th at 133, or discrimination in

10

BOP employment programs, *see Mays*, 70 F.4th at 200, implicate "'not only the scope of [each official's] responsibilities and duties' but also the organizational policies, administrative decisions, and economic concerns inextricably tied to inmate transfer and placement determinations." *Bulger*, 62 F.4th at 138 (quoting *Tate*, 54 F.4th at 846).

What's more, recognizing these claims "could open the door for increased litigation over the myriad decisions made every day regarding inmate discipline, transfer, and employment across the entire BOP system." *Mays*, 70 F.4th at 206. The uncertainty about the extent of these systemwide consequences foreclosed relief. *Id.* Thus, in *Tate*, *Bulger*, and *Mays*, our conclusion that the claims risked a cascade of systemwide consequences hinged on the fact that those claims implicated systemic decision-making and a broad swath of legitimate every-day BOP decisions.

But these factors do not apply with equal force to Fields's case, and thus they do not bar his claim.

IV.

Fields alleges that while he was being held in the Special Housing Unit, he was subject to egregious physical abuse with no imaginable penological benefit. The officers' alleged conduct amounts to a clear-cut constitutional violation that would easily withstand a motion to dismiss in a § 1983 case. Then, adding insult to injury, rogue officers intentionally withheld the administrative remedies that the executive branch has implemented to redress such violations. This must be a rare case. *See* Oral Arg. at 26:17–27:00 (the government conceding that the egregious abuse alleged here is rare and cannot

11

be condoned). If the officers' conduct alleged here is a frequent occurrence in prisons across the country, it would be a telling indictment of the American carceral system. In such a case, where an inmate brings a claim against individual, front-line officers who personally subjected the plaintiff to excessive force in clear violation of prison policy, and where rogue officers subsequently thwarted the inmate's access to alternative remedies, no special factors counsel against providing a judicial remedy.

Preliminarily, because Fields's allegations are exclusively against the individual front-line officers who subjected him to excessive force, the BOP, the warden, and the other supervisory officials named in the complaint must be dismissed. Fields himself concedes the BOP is not subject to suit under *Bivens* and he frames the allegations and claim as being only "against individual officers who commit[ed] isolated acts of abuse." Reply Br. at 1. While Fields contends that he can join supervisory officers as defendants pursuant to Federal Rule of Civil Procedure 20 even if his claim is against the front-line officers, that is true only if he has a cause of action against the supervisory officers. *See* Fed. R. Civ. P. 20 (permitting joinder of defendants against whom "a right to relief is asserted"). Because the allegations and Fields's arguments on appeal clearly present his claim as being against the front-line officers only, he cannot join supervisory officers under Rule 20. Accordingly, we affirm the district court's opinion in so far as it dismissed the claims against the BOP and supervisory officers, and we proceed with our *Bivens* analysis only with respect to the individual front-line officers who personally subjected Fields to excessive force.

12

Under the circumstances presented here, the risk of systemwide consequences identified in our prior cases is negligible. In *Tate*, *Bulger*, *Mays*, and *Earle*, our concern about systemwide consequences stemmed from the fact that the claims in those cases implicated prison policies and broader systemic concerns. *See Tate*, 54 F.4th at 846; *Bulger*, 62 F.4th at 141–42; *Mays*, 70 F.4th at 206; *Earle*, 990 F.3d at 780. That concern was heightened because those claims implicated issues of prison administration over which the BOP has broad discretion, requiring deference from the judiciary. *See Bulger*, 62 F.4th at 140–41 (noting Congress's choice to give the BOP discretion over inmate placement, inmate transfer, and housing decisions); *Mays*, 70 F.4th at 205 (stating that the BOP must be given deference concerning prison discipline and inmate employment); *Earle*, 990 F.3d at 781 (stating that extending *Bivens* for retaliation claims "could lead to an intolerable level of judicial intrusion into an issue best left to correctional experts").

By contrast, Fields challenges only the individual conduct of rogue prison officers. His claim implicates no prison policy.[2] In fact, part of his argument rests on the fact that

---

[2] The dissent asserts that the "individual instances of discrimination" challenged in *Mays* likewise concern only improper conduct by individual prison officials. The dissent's characterization of *Mays* ignores the fact that *Mays* also involved a procedural due process claim for the inmate's administrative detention and transfer to another institution without "notice or an opportunity to rebut the allegations." *Mays*, 70 F.4th at 201. That allegation certainly concerns systemic decision-making, not just individual discriminatory action. In accusing us of "cleverly reframe[ing] *Mays*," Dissent Op. at 31 n.10, it is the dissent itself that misconstrues our precedent. But even if the dissent were correct that *Mays* concerned only an allegation of discrimination, determining whether such an allegation is viable requires probing the entire system within which the discrimination occurred, not just the individual officer's conduct toward the plaintiff. By way of illustration, in Title VII cases, it is not enough for plaintiffs to allege how they were treated; to prove their claims, plaintiffs must additionally point to comparators who were treated differently. *See, e.g.,* (Continued)

13

the officers acted *in violation of* the relevant prison policy. *See* Opening Br. at 16; *see also*

*Younger v. Crowder*, 79 F.4th 373, 384 (4th Cir. 2023) (concluding that prison official's

violation of prison policy was evidence of Eighth Amendment violation in § 1983 case).

Thus, his claim does not masquerade as a "vehicle for altering an entity's policy," *Ziglar*

*v. Abbasi*, 582 U.S. 120, 140 (2017) (internal quotations omitted), but rather constitutes an

appropriate attempt to ensure *compliance* with the entity's policy.

Similarly, because the defendant officers are alleged to have violated prison policy,

they lacked the discretion to act as they did. Because Fields's claim is "narrow and

discrete" in that it concerns only the conduct of individual prison officers who acted in

violation of prison policy, it more closely resembles *Carlson* than this Court's recent

precedents. *See Tate*, 54 F.4th at 847 (distinguishing Tate's claims from those in *Carlson*

on the basis that Tate's claims were not "narrow and discrete"). In light of the body of

excessive force precedent that has been developed in the § 1983 context, Fields's claim,

like that in *Carlson*, also implicates "well-established criteria for liability and damages,"

further limiting the potential for systemic consequences presented when the judiciary

involves itself in an area where murky standards indicate broad BOP discretion. *See id.*

As such, claims like the one presented in this case do not present the risk of systemwide

---

*Spencer v. Va. State Univ.*, 919 F.3d 199, 207 (4th Cir. 2019). But determining whether force was excessive is a much narrower inquiry, which can be resolved with reference only to the facts of the incident of alleged excessive force. Consequently, this claim, unlike a discrimination claim like the one presented in *Mays*, is unique among our precedents in that it is "narrow and discrete." *See Tate*, 54 F.4th at 847.

consequences that our prior cases highlighted because they do not implicate systemic policies or unduly impose judicial oversight in areas over which the BOP has discretion.

To the extent that extending scrutiny to new categories of conduct or defendants implicates the potential for systemwide consequences, *see Bulger*, 62 F.4th at 140, this case's similarity to *Carlson* alleviates those concerns. *Carlson* already provides a cause of action against individual officers who fail to act to respond to an inmate's medical needs. Requiring individual officers to refrain from acting affirmatively to endanger an inmate's health implicates the same principles and affects the same defendants.

Relatedly, the impact on prison officials' discharge of their duties will be minimal. Because Fields's claim is brought only against front-line officers and does not implicate any systemic policies, by its very nature it cannot impact the discharge of supervisory officers' duties. And though the government raises the specter of frivolous litigation that could have a chilling effect on front-line officers' discharge of their duties, that concern is overstated. This case itself demonstrates why. The PLRA directs courts to prescreen cases brought by inmates "before docketing, if feasible." 28 U.S.C. § 1915A(a). As happened here, that means many cases will be dismissed before officers are even served. If officers never learn of cases filed against them, that litigation cannot have an impact on the discharge of their duties.

Next, though this Court has declined to extend *Bivens* to cases brought by federal inmates in the past, it has done so on the theory that inmates have access to alternative remedies. But that reasoning does not apply here—Fields lacked access to alternative remedies because prison officials *deliberately* thwarted his access to them. The

15

government argues that *Bulger* squarely forecloses any reliance on the unavailability of an administrative remedy in determining whether to extend *Bivens*. But *Bulger* does not properly apply. In *Bulger*, the inmate could not avail himself of the ARP because he died before he had a chance to file a formal grievance. *Bulger*, 62 F.4th at 141. We said that this special factor still counseled against a *Bivens* extension, despite the fact that the inmate's estate could not itself file a grievance through the ARP process and the inmate had not had time to do so. *Id.* But that holding concerned the inadequacy of the ARP itself, which was not broad enough in that case to provide the desired relief. *Bulger*, 62 F.4th at 141.

By contrast, here, the ARP is not the problem. The system put in place by the executive has the capacity to provide relief to Fields. Instead, the problem was the intentional improper conduct of the individual officers, which deprived Fields of access to the ARP. Unlike in *Bulger*, what is at issue here is not the ARP's adequacy or whether Fields can obtain the remedy he seeks through the ARP. Rather, the question is whether the ARP is operational, such that it can provide any remedy to any prisoner at all. And because Fields has alleged that officers intentionally subverted the operation of the ARP, its technical existence does not bar Fields's *Bivens* claim.

Permitting a *Bivens* claim to proceed where rogue officers intentionally subverted alternative remedies does not improperly arrogate power to the judiciary. "So long as Congress or the Executive has created a remedial process that it finds sufficient to secure an adequate level of deterrence, the courts cannot second-guess that calibration by superimposing a *Bivens* remedy." *Egbert*, 596 U.S. at 498. But when rogue officers thwart

16

the inmate's access to alternative remedies, it is the officers' conduct that interferes with the balance struck by the existing remedial scheme. As the government conceded at oral argument, no court (in this Circuit or otherwise) has ever before been presented with a case in which one of the allegations was that the grievance process was intentionally withheld from the inmate. Oral Arg. at 30:52–32:04. But in the unfortunate circumstance, such as this, where that scenario does arise, providing a judicial remedy is not a matter of "second-guess[ing the] calibration" effected by the coordinate branches because that calibration has already been disrupted. *See id.* Far from trampling on Congress's or the Executive's authority, the judiciary secures the objectives of the wrongfully displaced remedial scheme by stepping in.

The government also contends that the complaint indicates that Fields may have had access to and in fact did access some administrative remedies. Therefore, it argues, whatever may be true of purported excessive force claims without access to administrative remedies more broadly, Fields himself had access. But because Fields's complaint was filed pro se, we are required to construe it liberally and make all possible inferences in Fields's favor. *See Shaw*, 59 F.4th at 126. Viewing the complaint through that lens, it adequately alleges that all administrative remedies were withheld.[3]

---

[3] The government also argues that, even putting aside administrative remedies, the Federal Tort Claims Act provides an alternative remedy that bars a *Bivens* claim. But that argument is foreclosed by the Supreme Court's decision in *Carlson*, where it stated that the FTCA "contemplates that victims of the kind of intentional wrongdoing alleged in this complaint shall have an action under FTCA against the United States *as well as* a *Bivens* action against the individual officers." *Carlson*, 446 U.S. at 20 (emphasis added). Though this pronouncement is in tension with more recent Supreme Court precedent, it has never (Continued)

Finally, though the PLRA may counsel against extending *Bivens* in cases brought by inmates in federal prisons as a general matter, it cannot be true that it bars such claims in every case. It certainly does not counsel against extending *Bivens* in this case. When the PLRA was enacted in 1996, *Carlson* was already on the books. This Court has rightly noted that the PLRA's silence concerning an individual damages remedy for federal inmates "speaks volumes and counsels strongly against usurpation of the legislative function." *Bulger*, 62 F.4th at 141. But had Congress intended to bar all *Bivens* claims brought by federal inmates, it could easily have done so by statutorily overruling *Carlson*. Congress's decision to leave *Carlson* intact *also* "speaks volumes." *See id.* *Carlson*'s continued existence thus belies the claim that the PLRA bars *Bivens* actions by federal inmates wholesale.[4]

---

been directly overruled. Supreme Court's decisions "remain binding precedent until [the Supreme Court] see[s] fit to reconsider them, regardless of whether subsequent cases have raised doubts about their vitality," *Bosse v. Oklahoma*, 580 U.S. 1, 3 (2016) (internal quotation omitted), so we are bound by this ruling.

[4] Contrary to the dissent's assertion, *see* Dissent Op. at 24–25, we do not take Congress's decision not to overrule *Carlson* as a green light for implying new *Bivens* causes of action in the prison context. We recognize, as the dissent also points out, that the Supreme Court has rejected that approach. *See* Dissent Op. at 25 (citing *Hernandez*, 589 U.S. at 111 n.9). The dissent takes the Supreme Court's admonition that Congress's decision to leave *Carlson* intact is "not a license to create a new *Bivens* remedy in a context we have never before addressed," *Hernandez*, 589 U.S. at 111 n.9, as an affirmative instruction *not* to extend *Bivens*. But that takes it too far. Rather, Congress's decision to leave *Carlson* intact is a neutral fact, telling us only what we already knew: that *Bivens* extensions are "disfavored," *Ziglar*, 582 U.S. at 121, but that the proverbial door to a *Bivens* extension remains slightly ajar. *Cf. Egbert*, 596 U.S. at 504 (Gorsuch, J., concurring). Because Congressional silence on this question does not resolve the issue one way or the other, we must look elsewhere to determine whether Fields's claim is one that can proceed through that proverbial door.

The question then is whether the PLRA prohibits an implied cause of action in *this* case. As we explain below, because Fields alleged that no alternative remedy was in fact available, the theoretical existence of administrative remedies cannot bar his recourse to the judiciary to obtain a remedy. This balance between the preference for administrative remedies and the recognition that rogue actors can make administrative remedies functionally inoperable is entirely in line with the PLRA. As a general matter, the PLRA requires inmates to exhaust administrative remedies that "are available" before filing a lawsuit. *See* 42 U.S.C. § 1997e(a). But while an inmate "must exhaust available remedies," they "need not exhaust unavailable ones." *Ross v. Blake*, 578 U.S. 632, 642 (2016). Crucially, the Supreme Court has stated that an administrative remedy is "unavailable" for purposes of the PLRA where, as here, "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 644.

The PLRA permits prisoners to bring lawsuits for physical injuries, *see* 42 U.S.C. § 1997e(e) (limiting recovery only for "mental or emotional injury"), and because the PLRA was enacted in an era where *Bivens* extensions were more readily available than they are today, the omission of an individual-capacity damages remedy is not necessarily indicative of intent to prohibit such a remedy. The purpose of the PLRA is to *reduce* prisoner litigation, not do away with it entirely, and most of its provisions are procedural, rather than substantive, bars. Because the PLRA grants inmates access to the courts where prison officials thwarted their ability to utilize administrative procedures, permitting cases such as this to proceed under *Bivens* does not "conflict with Congress's choice," as expressed in the PLRA,

concerning the remedies and procedures available to aggrieved inmates. *See Bulger*, 62 F.4th at 141.

V.

For the foregoing reasons, we affirm in part and reverse in part the district court's dismissal of Fields's claims. We affirm the dismissal of Fields's excessive force claim as to the BOP, USP Lee's warden, and other supervisory prison officials who were not personally involved in the conduct alleged in the complaint. We reverse and remand Fields's excessive force claim as to the individual officers who personally subjected Fields to excessive force.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED*

RICHARDSON, Circuit Judge, dissenting:

My colleagues readily admit that "the tide has turned against *Bivens*." Majority Op. at 7. And before today's holding, one could well have believed that the Supreme Court had effectively ended lower courts' efforts to recognize novel implied money-damages actions for deprivations of constitutional rights. But my good friends in the majority claim to see a bit of wiggle room in the Supreme Court's repeated admonitions. The wiggle room they purport to detect, however, has been foreclosed by both that Court and this one. Yet the majority charges ahead. I must respectfully dissent.

In the forty-four years since the Supreme Court decided *Carlson v. Green*, 446 U.S. 14 (1980), it "has 'consistently rebuffed' every request—12 of them now—to find implied causes of action against federal officials for money damages under the Constitution."[1] *Tate v. Harmon*, 54 F.4th 839, 843 (4th Cir. 2022) (quoting *Hernández*, 589 U.S. at 102). And this Court has repeatedly observed that, while stopping short of overturning *Bivens* itself, "[t]he [Supreme] Court has made clear that expanding the *Bivens* remedy to a new context is an 'extraordinary act' . . . that will be unavailable 'in most every case.'" *Mays v. Smith*, 70 F.4th 198, 202 (4th Cir. 2023) (quoting *Egbert*, 596 U.S. at 492, 497 n.3); *see Bulger v. Hurwitz*, 62 F.4th 127, 136–37 (4th Cir. 2023); *Earle v. Shreves*, 990 F.3d 774, 778 (4th Cir. 2021); *Tate*, 54 F.4th at 843–45.

---

[1] *See Chappell v. Wallace*, 462 U.S. 296 (1983); *Bush v. Lucas*, 462 U.S. 367 (1983); *United States v. Stanley*, 483 U.S. 669 (1987); *Schweiker v. Chilicky*, 487 U.S. 412 (1988); *FDIC v. Meyer*, 510 U.S. 471 (1994); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61 (2001); *Wilkie v. Robbins*, 551 U.S. 537 (2007); *Hui v. Castaneda*, 559 U.S. 799 (2010); *Minneci v. Pollard*, 565 U.S. 118 (2012); *Ziglar v. Abbasi*, 582 U.S. 120 (2017); *Hernández v. Mesa*, 589 U.S. 93 (2020); *Egbert v. Boule*, 596 U.S. 483 (2022).

21

When faced with a *Bivens* claim, therefore, we conduct a "highly restrictive" two-step inquiry. *Bulger*, 62 F.4th at 137. We first ask whether the claim arises in a "new context," that is, one different from those to which the Supreme Court has already extended *Bivens*. *Egbert*, 596 U.S. at 492. This step need not detain us long because Fields rightly concedes that his case arises in a new context; the Supreme Court has never approved an implied damages action for prisoners' Eighth Amendment claims for excessive force. *See Ziglar*, 582 U.S. at 149 ("[T]he new-context inquiry is easily satisfied."); *Hernández*, 589 U.S. at 102 ("[O]ur understanding of a 'new context' is broad."); *id.* at 103 ("A claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized.").

So "we proceed to the second step and ask whether there are any 'special factors that counsel hesitation' about granting the extension." *Hernández*, 589 U.S. at 102 (quoting *Ziglar*, 582 U.S. at 136 (cleaned up)). There is no "exhaustive list" of factors that counsel hesitation. *Id.* (quoting *Ziglar*, 582 U.S. at 139). Yet we are not without guidance. The Court has told us that "separation-of-powers principles" should anchor our analysis. *Id.* (quoting *Ziglar*, 582 U.S. at 135). Courts must cautiously defer to the nation's lawmakers, who enjoy the principal—perhaps sole—authority to invent new legal causes of action for constitutional violations. *See Egbert*, 596 U.S. at 491–92 ("[A]bsent the utmost deference to Congress' preeminent authority in this area, the courts 'arrogat[e] legislative power.'" (quoting *Hernández*, 589 U.S. at 100 (second alteration in original))); *id.* at 502–03 (Gorsuch, J., concurring in the judgment); *Hernández*, 589 U.S. at 100–01; *id.* at 117–18 (Thomas, J., concurring); *Ziglar*, 582 U.S. at 135–36; *Carlson*, 446 U.S. at

22

27–28 (Powell, J., concurring); *id.* at 36–44, 51–53 (Rehnquist, J., dissenting); *Bivens*, 403 U.S. at 427–30 (Black, J., dissenting). Accordingly, if "there is any reason to think that Congress might be better equipped to create a damages remedy" than the judiciary is, then sanctioning a new *Bivens* action is inappropriate. *Egbert*, 596 U.S. at 492. And by "any reason," the Court means "*any* rational reason (even one) to think that *Congress* is better suited to 'weigh the costs and benefits of allowing a damages action to proceed.'" *Id.* at 496 (quoting *Ziglar*, 582 U.S. at 136).[2] Here, we have not just one reason, but three.

*Congressional inaction notwithstanding congressional attention*. The first factor counseling hesitation is that Congress has actively legislated in this area but has not enacted a statutory cause of action for money damages. *See Ziglar*, 582 U.S. at 148–49. Congress has been anything but absent from, and anything but silent on, the subject of prisoner litigation. *See Mays*, 70 F.4th at 206. The most obvious example is the Prison Litigation

---

[2] Congress will almost always be better equipped to create a damages remedy than courts are. *Egbert*, 596 U.S. at 491 ("Congress is 'far more competent than the Judiciary' to weigh [relevant] policy considerations." (quoting *Schweiker*, 487 U.S. at 423)); *id.* at 504 (Gorsuch, J., concurring) ("[I]f the only question is whether a court is 'better equipped' than Congress to weigh the value of a new cause of action, surely the right answer will always be no."); *Hernández*, 589 U.S. at 101; *Bivens*, 403 U.S. at 429 (Black, J., dissenting); *see also Bush*, 462 U.S. at 389 ("Not only has Congress developed considerable familiarity with balancing governmental efficiency and the rights of employees, but it also may inform itself through factfinding procedures such as hearings that are not available to the courts."). But a court need not actually determine that Congress is better equipped in order to refuse to recognize a new *Bivens* action. Given the deference to the legislature's primacy in this domain, a court need only find a single reason to "*think* that Congress *might* be better equipped to create a damages remedy." *Egbert*, 596 U.S. at 492 (emphasis added); *see also id.* at 496 ("[E]ven if there is the '*potential*' [that judicial intrusion is inappropriate], a court cannot afford a *Bivens* remedy." (quoting *Ziglar*, 582 U.S. at 140, 148)).

23

Reform Act of 1995 ("PLRA"), "which made comprehensive changes to the way prisoner abuse claims must be brought in federal court." *Ziglar*, 582 U.S. at 148. Despite having "specific occasion to consider the matter of prisoner abuse and . . . remed[ies for] those wrongs," Congress has not—in the PLRA or otherwise[3]—"provide[d] for a standalone damages remedy against federal jailers." *Id*. at 148–49. The logical takeaway from Congress's silence in an area where it has otherwise been active is "that Congress did not want a money damages remedy against" corrections officers. *Tun-Cos v. Perrotte*, 922 F.3d 514, 527 (4th Cir. 2019); *Schweiker*, 487 U.S. at 423 (explaining the need for "appropriate judicial deference to indications that congressional inaction has not been inadvertent"). Thus courts must not supply a damages remedy in its stead. *See Ziglar*, 582 U.S. at 148–49; *Mays*, 70 F.4th at 206; *Bulger*, 62 F.4th at 141.

My colleagues acknowledge the PLRA's silence with respect to damages remedies. *See* Majority Op. at 9. But they suggest that another form of congressional silence negates that "special factor counseling hesitation"—the fact that Congress did not statutorily overrule *Carlson*. *See* Majority Op. at 18. The Supreme Court, however, has expressly rejected that argument, holding that such congressional inaction "certainly does not suggest" a desire for "robust enforcement of *Bivens* remedies," let alone give "license to

---

[3] Congress evidently still has its eye on this issue. In early July 2024, it passed and sent to the President's desk for approval the Federal Prison Oversight Act, H.R. 3019, 118th Cong. § 2(a) (2024). The bill, which will presumably be signed any day now, focuses on establishing independent oversight mechanisms and improving transparency in the federal prison system. While it creates a new Ombudsman position to receive prisoner complaints, it conspicuously lacks a private money-damages action for prisoners' allegations of any constitutional violations.

create a new *Bivens* remedy in a context we have never before addressed." *Hernández*, 589 U.S. at 111 n.9 (citation omitted).[4]

Moreover, in emphasizing congressional silence following *Carlson*, the majority distorts the applicable test and the precedent applying it. The question is not whether "Congress intended to bar all *Bivens* claims" in a particular area. Majority Op. at 18. Rather, the question is whether "there are special factors counselling hesitation" about creating a new money-damages action "in the absence of *affirmative action* by Congress." *Ziglar*, 582 U.S. at 136 (quoting *Carlson*, 446 U.S. at 18 (emphasis added) (internal quotation marks omitted)).[5] In other words, we do not presume the power to create a damages remedy and then ask whether Congress explicitly forbade us from doing so; we instead presume that courts should not fashion legal remedies for constitutional violations and do not find that presumption overcome so long as "there is *even a single reason* to pause." *May*, 70 F.4th at 205 (quoting *Egbert*, 596 U.S. at 492). That Congress looked intently and specifically at prisoner litigation and offered no private damages remedy

---

[4] We do not know, of course, why Congress has failed to overrule *Carlson* (or *Bivens*, or *Davis v. Passman*, 442 U.S. 228 (1979)). But *Hernández* tells us that courts cannot use that failure as a reason to expand *Bivens*. 589 U.S. at 111 n.9. Chief Justice Rehnquist provided one possible reason for Congress's passivity: It might "reflect Congress' understanding (albeit erroneous) that *Bivens* was a constitutionally required decision." *Carlson*, 446 U.S. at 33 n.2 (Rehnquist, J., dissenting).

[5] Indeed, my colleagues' asserted standard bears a remarkable resemblance to the one the Court in *Egbert* expressly repudiated. *See* 596 U.S. at 501 ("*Passman* indicated that a damages remedy is appropriate unless Congress 'explicit[ly]' declares that a claimant 'may not recover damages.' . . . Now, though, we defer to 'congressional inaction' if 'the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms.'" (first quoting *Passman*, 442 U.S. at 246–47; and then quoting *Schweiker*, 487 U.S. at 423)).

should give us a reason to *think* that Congress *might* not want us to usurp its authority and create one ourselves. Thus we should not imply Fields's requested cause of action. *See* John C. Jeffries, Jr., et al., *Civil Rights Actions: Enforcing the Constitution* 34 (5th ed. 2022) ("The fact that Congress ha[s] legislated in the area without providing a damages remedy [i]s enough." (citing *Tun-Cos*, 922 F.3d 514)).

This is not just my view. It's what the Supreme Court has told us, *see Ziglar*, 582 U.S. at 148–49, and what prior panels of this Court have held, *see Bulger*, 62 F.4th at 141; *Mays*, 70 F.4th at 206. Whether we consider the Supreme Court's precedent or our own, therefore, the law is clear: The PLRA's lack of a damages remedy is a special factor counseling hesitation, even though Congress has not overruled *Carlson*.[6]

---

[6] In resisting the conclusion that the PLRA counsels against recognizing a *Bivens* action, my colleagues also assert:

> The PLRA permits prisoners to bring lawsuits for physical injuries, *see* 42 U.S.C. § 1997e(e) (limiting recovery only for "mental or emotional injury"), and because the PLRA was enacted in an era where *Bivens* extensions were more readily available than they are today, the omission of an individual-capacity damages remedy is not necessarily indicative of intent to prohibit such a remedy.

Majority Op. at 19. But rather than grant prisoners a cause of action or say what suits prisoners can bring, § 1997e(e) merely specifies one class of suits that prisoners *cannot* bring: Prisoners can't bring a claim based only on mental or emotional injuries, even if they have an express cause of action for damages under some other law. And since the PLRA was designed to limit, not promote, prisoner lawsuits, *see Jones v. Bock*, 549 U.S. 199, 203–04 (2007), the majority's use of a negative inference here is particularly ill-conceived, *see N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017) ("The force of any negative implication . . . depends on context." (citation omitted)). Furthermore, the notion that "*Bivens* extensions were more readily available than they are today" is questionable. *See* Cornelia T.L. Pillard, *Taking Fiction Seriously: The Strange Results of Public Officials' Individual Liability Under* Bivens, 88 Geo. L.J. 65, 66–68 (1999).

*Existence of an alternative remedial scheme.* The second factor counseling hesitation is that an alternative remedial scheme exists for aggrieved federal prisoners like Fields. A "court may not fashion a *Bivens* remedy if Congress has already provided, or has authorized the Executive to provide, 'an alternative remedial structure.'" *Egbert*, 596 U.S. at 493 (quoting *Ziglar*, 582 U.S. at 137). Several remedial mechanisms are already in place for inmates, "including suits in federal court for injunctive relief and grievances filed through the BOP's Administrative Remedy Program." *Malesko*, 534 U.S. at 74. "This program provides . . . a[] means through which allegedly unconstitutional actions and policies can be brought to the attention of the BOP and prevented from recurring." *Id.* True, such forward-looking relief differs from backward-facing money damages. But "it is for *Congress*," not us, "to decide whether to 'augment[]' any existing remedial scheme with a damages remedy." *Mays*, 70 F.4th at 206 (quoting *Tuns-Cos*, 922 F.3d at 527 (alteration in original)); *see Egbert*, 596 U.S. at 498.

My colleagues dismiss this as a special factor counseling hesitation on the grounds that "Fields lacked access to alternative remedies because prison officials *deliberately* thwarted his access to them." Majority Op. at 15. Yet that is "the wrong level of specificity" when deciding whether to imply a *Bivens* action. *Mays*, 70 F.4th at 206; *see Harper v. Nedd*, 71 F.4th 1181, 1188 (9th Cir. 2023); *cf. Stanley*, 483 U.S. at 681. We cannot myopically ask "whether *Bivens* relief is appropriate in light of the balance of circumstances in a 'particular case'"; instead, we must "ask '[m]ore broadly' whether there is any reason to think that 'judicial intrusion' into a given field might be 'harmful' or 'inappropriate.'" *Egbert*, 596 U.S. at 496 (quoting *Stanley*, 483 U.S. at 681, 683 (alteration

27

in original)); *see Bush*, 462 U.S. at 388.  For instance, the appellant in *Bulger* argued that the BOP's administrative remedies did not militate against finding a *Bivens* remedy because he did not have time to avail himself of them.  62 F.4th at 141.[7]  We declined to recognize a *Bivens* remedy even though the specific circumstances precluded Bulger's access to the administrative remedial scheme.  As we explained, the BOP's "elaborate remedial system" counseled against "the creation of a new judicial remedy," and "[t]he potential unavailability of a remedy in a particular circumstance does not warrant supplementing that scheme" ourselves.  *Id*. (quoting *Tun-Cos*, 922 F.3d at 527); *see also*

---

[7] I cannot agree with my colleagues' depiction of *Bulger* as simply raising the issues of whether the administrative remedy program was "broad enough . . . to provide the desired relief" or "whether [Bulger] c[ould] obtain the remedy he s[ought] through the" program.  Majority Op. at 16.  Bulger did not argue, for example, that the administrative remedy program was "inadequate" because he wanted money damages, as opposed to the other forms of relief the program provided.  Instead, he argued that he "had no real opportunity to initiate *any sort* of formal grievance process."  *Bulger*, 62 F.4th at 141 (emphasis added).  In other words, Bulger asserted that the administrative remedy program was insufficient because it was not "operational, such that it c[ould] provide any remedy" for him.  Majority Op. at 16.  Fields's contention is not meaningfully different from Bulger's.

28

*Harper*, 71 F.4th at 1188; *Sargeant v. Barfield*, 87 F.4th 358, 368 (7th Cir. 2023)[8]; *Pinson v. U.S. Dep't of Just.*, 514 F. Supp. 3d 232, 243–44 (D.D.C. 2021).[9]

*Consequences of implying the* Bivens *remedy.* Finally, the consequences of allowing Fields's requested relief cut against extending *Bivens*. We avoid permitting a *Bivens* remedy when doing so would "'impose liability on prison officials on a systemic level' and amount to a 'substantial burden' on government officials." *Mays*, 70 F.4th at 206 (quoting *Bulger*, 62 F.4th at 141); *see Ziglar*, 582 U.S. at 136. By authorizing a *Bivens* action for excessive force under the Eighth Amendment, our Court opens the door for a multitude of cases each year wherein prisoners claim excessive force in hopes of securing monetary damages. And even if we were not confident in that forecast, uncertainty about the broader ramifications of devising a *Bivens* remedy alone is a special factor counseling hesitation. *Egbert*, 596 U.S. at 493; *Mays*, 70 F.4th at 206. That's because federal courts "are ill-suited to 'predict the systemwide consequences of recognizing a cause of action

---

[8] *Compare* Majority Op. at 17 ("[N]o court (in this Circuit or otherwise) has ever before been presented with a case in which one of the allegations was that the grievance process was intentionally withheld from the inmate."), *with Sargeant*, 87 F.4th at 368 ("[Sargeant] also maintains that the grievance process was functionally unavailable to him: Barfield retaliated against him because he filed a grievance."), *and Pinson*, 514 F. Supp. 3d at 243 ("Pinson argues that the [administrative remedy program] was effectively unavailable to her because BOP officials refused to investigate her complaints.").

[9] As a last argument, my colleagues note that an inmate need not exhaust unavailable remedies under the PLRA. Majority Op. at 19. I fail to see how an excuse for failure to exhaust, which allows a prisoner to sue under a statutory scheme that does *not* provide a cause of action for money damages, somehow greenlights the creation of such a remedy here.

under *Bivens*.'" *Bulger*, 62 F.4th at 142 (quoting *Egbert*, 596 U.S. at 493). Such a cost-benefit analysis is for Congress to make. *Id.*; *supra* n.2.

My colleagues—who seem to think they, unlike other federal judges, are well-equipped for this inquiry—give several reasons why their holding will not lead to systemic consequences. To start, they say we can rest assured because the officers who Fields alleges violated his constitutional rights did so by going "rogue." *See* Majority Op. at 13–15. They explain that the officers who beat Fields on November 10 did so in clear violation of BOP policies about the treatment of prisoners. *Id.* at 13–14. And because no prison policy is directly implicated, they conclude, expanding *Bivens* here won't have systemic repercussions. *Id.*

But this conclusion rests on a misreading of precedent and another misconception of the appropriate level of generality for our inquiry. Contrary to the majority's representations, we have not found systemic consequences that caution against expanding *Bivens* only in those cases involving challenges to prison policies or the actions of officials acting in compliance with those policies. In fact, the prisoner in *Mays* argued that a *Bivens* remedy for his Fifth Amendment claims wouldn't substantially burden prison officials on a systemic scale because he sought only to redress "individual instances of discrimination and law enforcement overreach." 70 F.4th at 206. It's hard to imagine that the corrections officers who Mays alleged placed him in administrative detention, fired him from a prison job, and transferred him to a different prison because of his race acted pursuant to prison policy. *See id.* at 201. Still, we rejected Mays's argument and declined to expand *Bivens*, in part because doing so "would almost certainly 'impose liability on prison officials on a

30

systemic level' and amount to a 'substantial burden' on government officials." *Id*. at 206 (quoting *Bulger*, 62 F.4th at 141).[10]

The upshot is that we have recognized that even prisoners' suits alleging individual officers "went rogue"—*i.e.*, acted arguably or even clearly in violation of applicable BOP policy—can have systemic ramifications that warn against implying a legal remedy. The reason we have recognized as much is that we aren't concerned with the consequences of the case before us, but rather the consequences of creating a new damages remedy. *See id.* Sure, allowing Fields's claim to go forward may only directly affect several "rogue" corrections officers. But expanding *Bivens* to afford a remedy for Eighth Amendment excessive-force claims will impact virtually every prisoner and every prison official in our Circuit. The former will now be able to bring cognizable damages actions alleging the latter used excessive force; and the latter will constantly have to assess the risk of a lawsuit, possibly keeping them from "taking urgent and lawful action" when necessary to ensure prison security and prisoner safety. *Ziglar*, 582 U.S. at 145; *see Carlson*, 446 U.S. at 47 (Rehnquist, J., dissenting).

---

[10] The majority cleverly reframes *Mays* as being about prison policies rather than rogue officers by noting that *Mays* said the BOP is granted discretion over "inmate discipline and employment." Majority Op. at 13 (citing *Mays*, 70 F.4th at 205). What my colleagues seem to miss (aside from the actual allegations in *Mays*, of course) is that Fields's allegations also involve matters of inmate discipline over which prison officials have discretion—his treatment followed his failure to carry his movement pass as required and his alleged battery of a corrections officer. *See id.* at 4 ("Appellees argue that the officers' actions were justified because Fields initiated the scuffle."). [J.A. 10-11.] So if *Mays* indeed "implicated prison policies and broader systemic concerns," *id*. at 13, so too does this case.

This brings us to the majority's second attempt to dismiss the systemic effects its holding will have. According to it, "[t]he PLRA directs courts to prescreen cases brought by inmates 'before docketing, if feasible,'" so "many cases will be dismissed before officers are even served"; thus, there will be no burden on those officers. Majority Op. at 15 (quoting 28 U.S.C. § 1915A(a)). This ignores the facts that: (1) as just explained, the risk of suit alone places a substantial burden on prison officials that weighs against implying a *Bivens* remedy; and (2) the PLRA's screening procedure would by no means prevent the docketing of a deluge of suits against prison officials. When evaluating whether a prisoner's complaint fails to state a claim under the PLRA's screening provision, the court accepts his factual allegations as true. *See, e.g.*, *De'Lonta v. Fulmore*, 745 F. Supp. 2d 687, 690 (E.D. Va. 2010). All a prisoner must do to state a claim under today's holding, therefore, is *allege* that corrections officers used excessive force against him and later denied him access to administrative remedies (even if the latter allegations are contradictory and vague).[11] *Cf. Egbert*, 596 U.S. at 500 ("It is easy to allege that federal employees acted beyond the scope of their authority when claiming a constitutional

---

[11] I do not mean to suggest that prisoners will simply fabricate allegations, though of course some of that misbehavior is inevitable. But they could (like Fields) augment their excessive-force claims with vague allegations about obstruction and omit crucial context. For example, "my unit supervisors prevented me from accessing the administrative remedy program"—*temporarily, because I was in solitary confinement for harming another inmate or a corrections officer*. Or, "my unit supervisors prevented me from accessing the administrative remedy program"—*because I previously filed fifty frivolous grievances and triggered a restriction*. Or, "my unit supervisors prevented me from accessing the administrative remedy program"—*because they had already addressed my grievances in response to my verbal complaints*.

violation."). Suits will be docketed—and prison officials subjected to the costs of actual litigation—as long as those two allegations are present.

Finally, my colleagues say, "[t]o the extent that extending scrutiny to new categories of conduct or defendants implicates the potential for systemwide consequences, . . . *Carlson* already provides a cause of action against individual officers who fail to act to respond to an inmate's medical needs." Majority Op. at 15. This is baffling. The entire point of our analysis is to closely evaluate the propriety of extending *Bivens* to a *new* context, *i.e.*, one that "is different in a meaningful way from previous *Bivens* cases decided by th[e] Court." *Ziglar*, 582 U.S. at 139. The majority turns the inquiry on its head, finding that Fields's "new context" is a benefit, not a hinderance, to his claim.

*              *              *

As of now, the Supreme Court has chosen to leave its three approved *Bivens* causes of actions in place while effectively directing that lower courts should not create new ones. But given even the slightest crack in the door that the Court's beleaguered precedents leave, inferior courts continue to ignore the directive to stop extending *Bivens*. A faithful application of our precedent and the Supreme Court's leads squarely to the conclusion that we cannot create a new *Bivens* action here. But perhaps the majority's holding to the contrary shows it's time to simply shut the *Bivens* door completely. In any event, I respectfully dissent.

33